**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 93-4998

United States of America,

Plaintiff-Appellee,

VERSUS

Gary Jefferson Byrd,

Defendant-Appellant.

Appeal from the United States District Court
For the Western District of Louisiana

(                                    )

Before REYNALDO G. GARZA, DeMOSS and PARKER[*], Circuit Judges.

DeMOSS, Circuit Judge:

A jury convicted defendant-appellant Gary Jefferson Byrd of one count of receiving child pornography through the mail. The crime occurred on July 29, 1987, but Byrd was not indicted until April 16, 1992,[2] and he was convicted on December 14, 1992. Byrd

---

[*]In May 1994, when oral arguments were heard in this appeal, Judge Robert M. Parker was chief judge of the Eastern District of Texas, sitting on the appellate panel by designation. As of the date of this opinion, Judge Parker has been confirmed as a judge on the United States Fifth Circuit Court of Appeals.

[2]On August 7, 1992, a Fifth Circuit panel reversed Judge Haik's order to incarcerate Byrd without bail before trial. United States v. Byrd, 969 F.2d 106, 111 (5th Cir. 1992)(per curiam opinion by Jolly, Jones and Wiener, Circuit Judges).

received a pre-Guidelines sentence of 10 years in prison and a $65,000 fine. Byrd appeals his conviction and sentence. Finding no basis for reversal, we AFFIRM.

## FACTS

In May 1986, Byrd, then a psychiatrist in Opelousas, Louisiana, was targeted by an undercover child pornography "sting" operation. Agent William Shearer, a U.S. postal inspector based in New Orleans, chose Byrd for the sting after receiving a tip from a state police officer that Byrd was suspected by the Louisiana Department of Health and Human Resources ("D.H.H.R.") of over-sedating and sexually abusing a child.[3] The federal sting involved correspondence between Byrd and government investigators posing as the fictitious organizations "Freedom's Choice" and "Unique Video Imports." The important events and dates[4] are set out below:

! May 6, 1986: Byrd receives a "Sexual Preference Questionnaire" and "introduction letter" from "Freedom's Choice," which purported to be "an association concerned with the preservation of sexual freedom" offering to confidentially introduce "sexually liberated adults" to others with similar sexual preferences and help people find "friends they need for support when they become depressed over society's narrow-minded condemnation of their personal preferences."

---

[3]The D.H.H.R. ultimately closed this investigation and never made any finding that Byrd had committed such acts.

[4]The date and content of each item of correspondence is listed in detail because Byrd has claimed entrapment by the government, and the most recent Supreme Court case on entrapment and child pornography, Jacobson v. United States, 112 S.Ct. 1535 (1992), places importance on the chronology and character of the government's solicitations and the defendant's responses. Byrd does not dispute that he received and sent the correspondence at issue.

2

! <u>May 21, 1986</u>: Byrd fills out and mails back the "Sexual Preference Matching Questionnaire," using the false names of "Mr. and Mrs. James B. McIntosh" and indicating that he was interested in photos and VHS videotapes of pre-teen homosexual activity, pre-teen heterosexual activity, and sadomasochism. The form asked respondents to certify that "I am not a law enforcement officer of any kind attempting to entrap anyone." Byrd also hand-wrote on the form: "No letters, no personal contacts. Only merchandise catalogs or listings."

! <u>May 29, 1986</u>: "Freedom's Choice" sends a form letter to Byrd/"McIntosh" assigning him a confidential code number and providing him with two code numbers of "parties with similar interests."

! <u>June 13, 1986</u>: Byrd/"McIntosh," sends two identical letters to the code numbers provided, stating that he and "Mrs. McIntosh" are not interested in correspondence or personal contact with anyone, but "we are interested in receiving listings of VHS videotapes, descriptions of photographs, descriptions or listings of novels or topics of written materials related to the topics previously annotated. Our interest lies in possibly ordering selected items only for educational and research purposes."

! <u>December 23, 1986</u>: "Freedom's Choice" sends a letter to Byrd/"McIntosh" informing him that his name and address have been referred to "a supplier of unique, hard-to-obtain material," and that "you should be hearing from this party shortly."

! <u>January 26, 1987</u>: "Unique Video Imports" mails Byrd/"McIntosh" a list and order form describing sexually oriented videotapes for "standard viewers," and also informing him that a catalog for the "Miniature Erotica Collection" for "special viewers" is also available upon request. "Miniature Erotica" is described as "exotic videos" featuring "Lolita and Wonderboy[5] talent" that are "often difficult, if not impossible, to find."

! <u>February 20, 1987</u>: "Unique Video Imports" receives the completed video order form back from Byrd/"McIntosh." He did not order any "standard" videos, but he checked a box requesting the "Miniature Erotica Collection."

! <u>February 27, 1987</u>: "Unique Video Imports" mails to Byrd/"McIntosh" a "Miniature Erotica Collection" order form and list describing six 30-minute videos purporting to depict explicit sexual activity by children ranging from age 5 to 16.

---

[5]Testifying for the government at trial, a federal postal inspector familiar with the child pornography subculture stated that the terms "miniature erotica," "Lolita" and "Wonderboy" are terms used by that subculture to mean child pornography.

! March 2, 1987: Byrd/"McIntosh" fills out and sends in the "Miniature Erotica" order form, ordering two videotapes and enclosing money orders for payment. Byrd chose two tapes from the following descriptions:

"CARNIVALE: Hector celebrates gala festival with Juan, 5 years, Pablo, 7 years, and Roberto, 9 years. All four have great celebration with mutual masturbation, oral and anal sex."

"SCHOOL DAYS: Marco, 14 years, Krista, 13 years, and Bette, 12 years, unwind after a hard day at lessons. Interesting masturbation and oral sex, slight penetration."

! July 15, 1987: Byrd, in his own name, calls Agent Shearer's office in New Orleans and leaves a message.

! July 16, 1987: Byrd (using his own name) and Agent Shearer have a telephone conversation in which Byrd tells Shearer he has information about child abuse rings in the Opelousas area. In contrast to his later claims, Byrd in this conversation did not tell Shearer that he was aware of any ongoing undercover operation, or that he was attempting to perform some kind of "reverse sting" against that operation, or that he had ordered child pornography tapes through the mail for any purpose.

! July 29, 1987: Undercover officers from the U.S. Postal Service make a controlled delivery of the two ordered videotapes to Byrd's residence in Opelousas. Byrd was not home at the time of the delivery, but a cook employed by Byrd answered the door at Byrd's house, accepted delivery of the tapes and paid the postage due. A short time later, Byrd arrived home. Around the same time, government agents began a search of Byrd's residence pursuant to a search warrant. After Agent Shearer arrived a few minutes into the search, Byrd received his Miranda warnings and consented to be interviewed.

During the interview at his home on July 29, 1987, Byrd initially denied ever using the name "McIntosh" or ever ordering child pornography. He denied ever receiving or seeing any mail addressed to "McIntosh." Agent Schearer then confronted Byrd with the package containing the two child pornography tapes that had been delivered to "Mr. and Mrs. McIntosh" at Byrd's address. Byrd stated that he wasn't at home when the package was delivered. He then stated that mail addressed to McIntosh had arrived at his

4

address before, but he did not know what had happened to it. The search of Byrd's house was still going on at this point. Later in the interview, Byrd was confronted with the "McIntosh file" with copies of the correspondence described above, which Byrd had compiled and which was found in his attic during the search. Initially, Byrd said the file was an old patient file. Later, he stated that it was a research file. At this point in the interview, Byrd began a rambling discourse with Agent Shearer, talking in very general terms about an investigation he was conducting into a pedophile ring involving the Catholic Church, the Louisiana D.H.H.R. and various high-level government officials. Byrd told Shearer he had been to Shearer's office that same day, July 29, 1987, to give him evidence involving these matters. Changing his story again, Byrd then admitted that he has ordered the child pornography videos under the name of McIntosh, but stated that he had done so for research involving the D.H.H.R. and the pedophile rings.

Two young boys present in Byrd's home at the time of the search were also interviewed by government agents. During 1986 and 1987, Byrd had custody of two foster children, Brian, then 6 years old, and Shaun, then 8 years old. On the day of the search, Byrd's foster sons helped the agents to locate the seized evidence described below.

In addition to the "McIntosh file," several boxes of evidence were seized from Byrd's residence, including: (1) a series of Polaroid photographs of nude boys with crudely written color-coded

5

descriptions of bruises and red marks on the boys' buttocks caused by paddling; (2) another series of Polaroid photos, most of teen and pre-teen boys with their bare buttocks exposed; (3) a manila folder labeled "Michael & John Michael Special Project Folder," which contained a hand-written questionnaire graphically describing homosexual and heterosexual sex acts involving children; (4) a picture book titled "Show Me," containing explicit photographs of nude children and nude adults discussing and engaging in sexual activity, which was designed to satisfy children's curiosity about sex; (5) seven wooden paddles which Byrd admitted he used to spank his young foster sons, sometimes taking photographs afterwards to "document" the bruises on their buttocks.

The agents interviewed Byrd's foster sons, Brian and Shaun, on the day of the search, and Shaun later testified at trial. Both boys had come from abusive homes and had some behavioral problems. Byrd had been attempting unsuccessfully to adopt Shaun and had had disagreements with the D.H.H.R. in connection with the adoption process. Both boys slept every night with Byrd in his bed. Byrd testified that the sleeping arrangements were because of the boys' fear of the dark. However, Shaun testified at trial that he was not afraid of the dark and had expected to have his own room, but that he slept with Byrd because "that was his wishes."

Shaun testified that Byrd put his hand inside Shaun's underwear and fondled the boy's genitals while they were in bed at night. Shaun was 14 years old when he testified at trial, and he had been 8 and 9 years old at the time of the fondling. He said

6

Byrd touched his genitals almost every night, and that he didn't tell anyone right away because he didn't know that it was wrong, and because "he said he was my dad." Shaun also testified that Byrd spanked him on the bare buttocks with paddles almost every day, hard enough to leave bruises and bright red marks, as punishment for misbehavior.

Another child, Kevin, also testified at trial that Byrd had fondled him when he came to the house to visit Brian and Shaun and spend the night. Kevin, 18 years old at the time of trial, was 13 when the fondling occurred. In a deposition taken when he was 14 years old, Kevin had denied being fondled. When he was cross-examined at Byrd's trial with the contradictory testimony, Kevin stated that he had been ashamed back then to tell anyone about the fondling. In separate testimony, Byrd stated that he had paddled Kevin at least twice. One of the photographs introduced into evidence showed Kevin asleep in Byrd's bed with his underwear pulled down to show the paddle marks.

The boys' stories and the items seized on July 29, 1987 prompted Louisiana prosecutors to bring criminal charges of sexual battery against Byrd. The state charges were ultimately dismissed on September 6, 1991.[6] Thereafter, at the request of the U.S.

---

[6]In the state prosecution, Byrd's motion to suppress evidence was granted by the trial court. The suppression ruling was reversed on appeal, but the sexual battery charges were ultimately dismissed, either because the prescription period had run out or for failure of the district attorney to comply with the speedy trial requirements of the state of Louisiana. Byrd claims that the charges were dropped in part because the boys recanted their stories. The United States, in contrast, states that the dismissal of the Louisiana charges was not a result of

Customs Service and U.S. Postal Service, federal prosecutors in the Western District of Louisiana took a renewed interest in the matter, and Byrd was indicted on April 16, 1992 on a federal charge of knowing receipt of child pornography.[7]

## ISSUES

Byrd challenges his conviction and sentence, claiming numerous grounds for reversal. We will address four main issues: (1) Whether the evidence was sufficient to support the jury's finding that Byrd was predisposed to receive child pornography; (2) whether the trial court abused its discretion in refusing to dismiss the case for pre-indictment delay; (3) whether the trial court abused its discretion in denying Byrd's motion to suppress; and (4) whether Byrd's sentence was excessive.[8]

## ANALYSIS

### Entrapment and Predisposition

Byrd claims the government, by its sting operation, entrapped him into ordering the child pornography tapes. He relies heavily on the Supreme Court case of Jacobson v. United States, 112 S.Ct.

---

any deficiency in the quality of the state's case for sexual battery.

[7]The statute in effect at the time of the offense in 1987 provided penalties for "[a]ny person who knowingly receives ... any visual depiction that has been ... mailed ... if the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and such visual depiction is of such conduct." 18 U.S.C. § 2252(a)(2) (West 1984).

[8]Byrd also challenges several evidentiary rulings by the trial court, complains that his requested jury instructions were refused and argues that he should receive a new trial because the district judge was biased against him. We find no merit in these contentions.

1535, 1543 (1992). It is well-settled that government agents may use undercover agents to enforce the law, and may even employ "artifice and stratagem," Sorrells v. United States, 287 U.S. 435, 441 (1932).

> "In their zeal to enforce the law, however, Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute."

Jacobson, 112 S.Ct. at 1540. When the government, by use of a sting operation or otherwise, has induced an individual to break the law, and the defense of entrapment is at issue, the prosecution must prove beyond a reasonable doubt that the defendant was inclined to commit the criminal act even before he was approached by government agents. Id. at 1540. The facts in Byrd's case are somewhat similar to the facts in Jacobson. Keith Jacobson was also targeted by a government sting. Over a two-and-a-half-year period, the government sent Jacobson numerous letters, questionnaires and communications from five different fictitious sexually oriented organizations. Jacobson eventually ordered and received a child pornography magazine and was prosecuted under 18 U.S.C. § 2252(a)(2). An Eighth Circuit panel initially reversed Jacobson's conviction, but on rehearing en banc, the full Eighth Circuit affirmed the conviction. The Supreme Court, in a 5-4 decision, reversed on the basis that the government failed to prove beyond a reasonable doubt that Jacobson was independently predisposed to commit the crime of receiving child pornography through the mail. Jacobson, 112 S.Ct. at 1543.

9

Because the government has the burden to prove predisposition, the issue is in essence a challenge to the sufficiency of the government's evidence. The appellate court must therefore accept every fact in the light most favorable to jury's guilty verdict, and may reverse only if no rational jury could have found predisposition beyond a reasonable doubt. United States v. Sandoval, 20 F.3d. 134, 137 (5th Cir. 1994).

Jacobson held that when an undercover agent merely offers a person the opportunity to break the law, and the person eagerly does so -- as in a typical illegal drug sting -- the person's ready commission of the crime amply demonstrates predisposition. In such a case, the defendant is usually not entitled to a jury instruction on the entrapment defense. Jacobson, 112 S.Ct. at 1541. But in Jacobson, the government sent the defendant correspondence for more than two years that (1) exerted pressure on him to join their lobbying battle for "freedom of choice" and repeal of "oppressive" pornography laws; (2) decried "international censorship," and called the concern about child pornography "hysterical nonsense"; (3) suggested that purchase of such materials should be legal; (4) assured Jacobson that if he ordered their materials, the package could not legally be opened for inspection without authorization from a judge; (5) repeatedly played on what they knew to be Jacobson's "general inclination" to view sexually oriented photographs of young men and boys; and (6) asked Jacobson to affirm that he was not a government agent attempting to entrap the mail order company or its customers. Id. at 1542-43. Jacboson's

10

responses indicated some interest in pre-teen and teenage sexuality, but he also stated specifically that he was opposed to pedophilia. Jacobson seemed more interested in the theme of lobbying for changes in the law and fighting censorship. In response to a survey question, Jacobson wrote:

> "Not only sexual expression but freedom of the press is under attack. We must be ever vigilant to counter attack right wing fundamentalists who are determined to curtail our freedoms."

Jacobson, 112 S. Ct. at 1538. He was supplied with code numbers of potential "pen pals," but did not initiate any correspondence. A government investigator nevertheless began writing to Jacobson through the code number system, and Jacobson wrote two letters in response. Jacobson's letters never mentioned child pornography; he mentioned only an interest in "good looking young guys (in their late teens and early 20's) doing their thing together." After two letters, Jacobson stopped writing. Despite Jacobson's seeming lack of interest, the government, using two different fictitious organizations, continued to send Jacobson brochures advertising photographs of young boys engaging in sex and letters discussing the fight against censorship. Jacobson finally succumbed to his curiosity and placed an order for a child pornography magazine. The Supreme Court held:

> "Although [Jacobson] had become predisposed to break the law by May 1987, it is our view that the Government did not prove that this predisposition was independent and not the product of the attention that the Government had directed at petitioner since January 1985."

Id. at 1541. Byrd argues that Jacobson requires the government to prove predisposition only by evidence that existed before the

11

government began its solicitation. This argument misstates the Jacobson holding. We agree with the Eleventh Circuit's reasoning in United States v. Aibejeris, 28 F.3d 97 (11th Cir. 1994):

> "Aibejeris makes the argument that [Jacobson] requires the government to prove that it had evidence that Aibejeris was disposed to commit the underlying crime prior to engaging in an investigation of him. This is an incorrect reading of Jacobson. That case does not stand for the proposition that the government must have evidence of predisposition prior to investigation. Rather, Jacobson holds that the government must prove at trial beyond a reasonable doubt that the defendant was actually predisposed to commit the underlying crime absent the government's role in assisting such commission."

Aibejeris, 28 F.3d at 97. Although we recognize that, by definition, predisposition must exist before government intervention, we believe the crucial holding of Jacobson is that predisposition must be independent of government action. Evidence of the defendant's ready response to the solicitation, as well as evidence of independently motivated behavior that occurs after government solicitation begins, can be used to prove that the defendant was predisposed, i.e., ready and willing to order child pornography even before he was contacted by the government.

In this case, Byrd's eager and prompt response to each government mailing illustrates his predisposition. Only a few weeks after the first government contact, Byrd returned the questionnaire, indicating that his only interests were in VHS videotapes of pre-teen sexual activity and sadomasochism. He also hand-wrote a message on the form specifically requesting "merchandise catalogs and listings." About two weeks after the next government reply, Byrd wrote two letters again specifically asking

12

for "listings of VHS videotapes" and other materials on "the topics previously annotated." When the government sent a listing of available videotapes, Byrd again responded before a month had passed. Byrd ignored the adult pornography selections, but instead requested "Miniature Erotica," which was identified in expert testimony as a subculture term for child pornography. The government complied with Byrd's request and sent the list of available child pornography tapes, which were described in explicit language that left no doubt as to their content. Again, Byrd showed no hesitation; he mailed his order for two videotapes within five days, enclosing money orders for payment. These actions do not show entrapment. The government "simply offered [Byrd] the opportunity to order child pornography through the mails," and Byrd "promptly availed himself of this criminal opportunity." See Jacobson, 112 S. Ct. at 1541. Byrd's repeated requests for catalogs of pre-teen sex videos -- and his prompt ordering of such tapes as soon as he received the catalog -- constitutes a "ready commission of the crime" and amply demonstrated his predisposition. Id. In contrast, Jacobson did not go out of his way to request video catalogs. His responses to the various surveys indicated an "above average" but not "high" interest in preteen and teenage sexuality, and he responded most enthusiastically to the correspondence discussing freedom of choice and lobbying battles against censorship. When Jacobson's home was searched, investigators found only the one nudist magazine that had prompted the sting investigation and the materials the government had sent. No additional evidence ever

13

linked Jacobson to pedophilia or child pornography.

In Byrd's case there was more evidence, in addition to his demonstrated eagerness to order child pornography, that showed Byrd's predisposition to order such materials both prior to and independent of the government's solicitations.[9] Some of the evidence existed before the government sting began. The "Show Me!" book[10] was purchased in 1981, and Byrd testified that he compiled the "Michael & John Michael Special Project File," a sexually explicit questionnaire for 9-year-old boys, in 1981, years before

---

[9]Much of this additional evidence tended to prove that Byrd had an abnormal sexual attraction to children that progressed to the point of inappropriate and illegal behavior with children in his home. For the reasons we will explain in this opinion, we conclude that the link in this case between child pornography and pedophilia is strong enough that evidence of Byrd's pedophilic behavior was properly used to show his predisposition to order and receive child pornography through the mail. The Supreme Court has recognized the link between child pornography and pedophilia, noting that pedophiles often use such materials to seduce their child victims into sexual activity. Osborne v. Ohio, 110 S. Ct. 1691, 1697 & n.7 (1990). In addition, there is evidence that child pornography may induce viewers to commit sex crimes on children. David B. Johnson, *Why the Possession of Computer-Generated Child Pornography Can Be Constitutionally Prohibited*, 4 ALB. L.J. SCI. & TECH. 311, 326 & n.141 (1994)(citing 1 U.S. Dep't of Justice, *Attorney General's Commission on Pornography: Final Report* 649-50 (1986).

[10]The "Show Me!" book is an English language edition of a German sex education text. It is obtainable legally at libraries in the United States, although it contains photographs which technically meet the legal definition of child pornography under 18 U.S.C. §§ 2252 and 2255. For example, an explicit photograph of a pre-teen boy and pre-teen girl is accompanied by the caption, "When I touch your breasts my penis gets all stiff." Another photograph of the same two children is captioned, "It's fun holding on to your penis." In a hearing before the Louisiana state court, Agent Shearer testified that postal inspectors know the book as a "pedophile's Bible." "I found it on at least three other occasions in suspected preferential child molester residences. It's a tool, used by a preferential child molester."

the government sting began. Both the book and the "Special Project File," even if not conclusive standing alone, are at least corroborating evidence that Byrd had an inappropriate sexual interest in children and would be inclined to order and receive child pornography through the mail. See United States v. Gendron, 18 F.3d 955, 969 (1st Cir. 1994)(holding that legally obtained "child erotic" materials found in defendant's home, although not by themselves dispositive, were relevant and properly admitted to show predisposition to receive child pornography in the mail); United States v. Cross, 928 F.2d 1030, 1050 (11th Cir. 1991)(noting that pedophiles may collect and derive sexual satisfaction from even non-sexual nude photographs of children, and holding such testimony relevant on intent in child pornography prosecution), cert. denied, 112 S. Ct. 594 (1991); United States v. Nelson, 847 F.2d 285, 288 (6th Cir. 1988)(holding that paperback books containing written descriptions of minor children engaged in sexual acts were properly seized and relevant to show predisposition to receive child pornography in the mail).

Other evidence confirming Byrd's predisposition included the Polaroid photographs and the testimony that Byrd fondled two young boys in 1986 and 1987 and repeatedly paddled and photographed his foster sons. The paddling, photographs and fondling occurred after the government sting began, but these actions were clearly independent of the government's sting; no rational jury could conclude that the government's correspondence caused Byrd to engage

15

in pedophilic behavior.[11] Keith Jacobson, in contrast, did not engage in any similar independently motivated behavior; instead he made clear to the purported "American Hedonist Society" that he was opposed to pedophilia. Jacobson testified that he responded to government solicitations and placed an order only because the repeated mailings "had succeeded in piquing his curiosity." Jacobson, 112 S. Ct. at 1540.

Finally, Byrd's claim that he was "entrapped" into ordering child pornography contradicts his main defense argument at trial -- that he ordered the tapes only to conduct a "reverse sting" on government agents, specifically the Louisiana D.H.H.R., which he claims he thought was out to get him. The jury chose to disbelieve Byrd's "reverse sting" defense, and Byrd, unlike Jacobson, never put on any evidence tending to show that he had been beguiled against his will to order the tapes for sexual gratification. Instead, Byrd made several confused and overlapping defense arguments at trial and in his appellate brief. He claims that he was corresponding with sexually oriented businesses in an attempt to gather information in order to understand his patients. He made an analogy, stating that if he were treating a heroin addict, he would gather information from all sources, from studying prestigious university research all the way down to questioning a drug addict in a bus station. Similarly, Byrd stated, he corresponded with "sleazy" sexually oriented organizations to get

---

[11]Amazingly, Byrd appears to make this preposterous argument in both his original brief and his reply brief to this Court.

16

information, and he used the false name of "McIntosh" so that if he received solicitation mail he would know where it was coming from. He also claims he used the false name so he could refuse delivery of the tapes he had ordered, such refusal being part of his "reverse sting" plan to catch the D.H.H.R. at its own game.

The jury also chose to disbelieve Byrd's explanation of the Polaroid photographs. Byrd testified that he took frontal and rear nude photographs of Brian, 6 or 7 at the time, to protect himself, because Brian would sometimes be abused when he went home to visit his parents. The photos were ostensibly to document the absence of bruises when Brian left Byrd's home. Byrd stated that he took similar nude photos of Shaun because Shaun "felt left out." Shaun, however, testified that he hated cameras and disliked being photographed. One of the photographs introduced into evidence was taken of Shaun at age 8 after Byrd paddled him for the first time. Byrd admitted taking this photograph "as part of a before-and-after sequence." The photograph showed bright red marks from the paddling, which the government's expert witness, Dr. Edward Shwery, characterized as "child abuse." Even Byrd's expert witness, Dr. Louis Cenac, agreed that the photograph of Shaun showed "physical abuse."

Byrd testified that he paddled the boys as corporal punishment to deter dangerous misbehavior such as running into the street, playing with matches or gasoline, and going near the railroad tracks. Byrd said he took "before and after" photographs of the boys' naked buttocks to document the effects of the paddling and

17

avoid allegations of child abuse.

A rational jury could have chosen to discredit Byrd's explanations, especially in the light of testimony from the government's expert that the photographs show an abnormal obsession with the children's nudity rather than an objective attempt to document their physical condition. Even Byrd's expert witness admitted that the paddling photographs would be intriguing to a pedophile, especially a pedophile who enjoys causing physical abuse to children. Both experts testified that it is inappropriate and possibly traumatic for either a child psychologist or a parent to paddle a child and then to take full frontal and rear nude photographs of him. Byrd's written notes accompanying the photos also demonstrate an inappropriate motive. A color-coded index -- in Byrd's handwriting on the back of an envelope -- described the paddling bruises using such categories as, "likely excessive," "better but possible excessive," and "certainly acceptable but may not be effective." Many of the photographs appear to be of the boys asleep in bed, with their underwear pulled down to expose their buttocks. Byrd denied taking some of the photos, saying that the boys and their friends took some of the photos of each other.

Byrd also gave an explanation for the "Michael Special Project folder." Byrd claims he compiled the sexually descriptive questions in 1981 when he lived in Houston, to submit to two 9-year-old boys with the permission of their mothers, "to ascertain whether a story overheard by Byrd between the boys in question had actually occurred or was just the boys' imagination or a combination of the

18

two." The questions in the folder, which were informally handwritten on pages from a legal pad, asked the boys how hard they should be spanked for described conduct, specifying in detail whether the spanking should be with a hand, a belt or a paddle, with pants up or down, the number of blows and how hard. The questions also asked whether the boys had ever participated in any of the acts described, which were stated in very graphic language. The acts included sexual intercourse with a "9-year-old neighbor girl," sexual intercourse with "a sheep or pig," masturbation, anal rape of a boy by a man, and oral and anal sex between young boys. Dr. Shwery, the government's psychology expert, said the "Special Project File" questionnaire could not be called legitimate research under any standards familiar to him, and actually "more closely resembled torture." Dr. Shwery said that several of the questions showed blatant pedophilic motivation, for example:

> "During the past year or so I have been able to express my love and to allow a person who loves me to express love both verbally and <u>physically</u> and I no longer feel uptight or guilty about it but I still know that it must always be private."

Even defendant's psychology expert called the questionnaire "very poor research design," containing "grossly inappropriate" and "unprofessional" language tending to introduce children to adult sexuality.

We hold that a reasonable jury could have disbelieved Byrd's explanations and arguments and drawn inferences from the various pieces of evidence that Byrd was predisposed to receive child pornography both prior to and independent of the government's

19

sting. The testimony of the boys and the materials seized from Byrd's home are evidence that Byrd had an abnormal sexual attraction to children, which had caused him to engage in inappropriate, abusive and illegal behavior with the children in his home. Both psychology experts testified that the "Special Project" questionnaire, the paddles, the Polaroid photographs and the "Show Me!" book were all typical materials that a person having an abnormal sexual interest in children would possess. Byrd's psychology expert conceded that the ordering of tapes of preteen sex is consistent with a step that a pedophile will normally take to prepare or sensitize a child to sexuality. Pedophiles use child pornography for gratifying their own sexual desires, reducing the inhibitions of their victims and instructing their victims on proper sexual performance.[12] In addition to citing the case law and expert testimony that links pedophilia to child pornography, we also note that common sense would indicate that a person who is sexually interested in children is likely to also be inclined, i.e., predisposed, to order and receive child pornography. We conclude that there is a strong enough link between pedophilic behavior and child pornography to allow a jury to find predisposition in this case. In addition, there was other strong evidence of predisposition -- Byrd promptly responded to each government solicitation, specifically requested videotape catalogs

_____

[12]See Osborne v. Ohio, 110 S. Ct. 1691, 1697 & n.7 (1990)("A child who is reluctant to engage in sexual activity with an adult or to pose for sexually explicit photos can sometimes be convinced by viewing other children having `fun' participating in the activity.").

20

on pre-teen sex and sadomasochism, indicated an interest in "Miniature Erotica," and wasted no time in ordering two videotapes whose descriptions clearly indicated child pornography. The jury chose to disbelieve Byrd's alternate explanations for his behavior. We hold that the evidence was sufficient to support the jury's finding that Byrd was predisposed to commit the crime of receiving child pornography in the mail.

## Pre-Indictment Delay

Byrd claims that he was denied a speedy trial because he was not indicted until April 16, 1992, nearly five years after the date of the offense. He claims that actual prejudice to his defense should be "presumed" under Doggett v. United States, 112 S. Ct. 2686, 2694 (1992). Byrd's reliance on Doggett is misplaced. Doggett dealt with post-indictment delay, which implicates a defendant's right to a speedy trial under the Sixth Amendment. In contrast, pre-indictment delay does not raise a Sixth Amendment issue, but is instead examined under the due process clause of the Fifth Amendment. United States v. Marion, 404 U.S. 307 (1971); United States v. Beszborn, 21 F.3d 62, 66 (1994); United States v. Harrison, 918 F.2d 469, 473 (5th Cir. 1990)(holding that "there is no Sixth Amendment right to a speedy indictment."). To prove that pre-indictment delay violated his due process rights, a defendant must demonstrate that the prosecutor intentionally delayed the indictment to gain a tactical advantage and that the defendant incurred actual prejudice as a result of the delay. United States v. Neal, 27 F.3d 1035 (5th Cir. 1994); Beszborn, 21 F.3d at 66. The

21

reason the defendant bears the burden of proof in a case of preindictment delay is because the applicable statutes of limitation provide the primary guarantee against overly stale criminal charges. <u>Harrison</u>, 918 F.2d at 473. In this case, the United States indicted Byrd within the five-year statute of limitations, so Byrd has the burden of proving both intentional tactical delay by prosecutors <u>and</u> actual prejudice. Byrd did not prove that federal prosecutors delayed the indictment for tactical reasons. Rather, the facts show that the federal government deferred prosecution because the state of Louisiana was pursuing charges against Byrd in connection with the same course of conduct. After the state charges were dismissed, the federal prosecutors sought and obtained an indictment within about seven months. This does not show intentional delay for a tactical advantage. <u>Cf.</u> <u>Dickerson v. Guste</u>, 932 F.2d 1142, 1144 (5th Cir. 1991)(no intentional delay when defendant's incarceration in federal prison delayed state indictment for more than five years), <u>cert. denied</u>, 112 S. Ct. 214 (1991).[13] Because Byrd did not meet the required

---

[13]Because Byrd has not shown intentional delay, we need not consider his claim of actual prejudice from the delay. However, we note that his claims of dead witnesses, lost records and faded memories are not convincing. Most of the "evidence" he claims was lost relates to his alternate explanations for the Polaroid photographs, the "Special Project" folder questionnaire and his ordering of the child pornography tapes under the false name of "James McIntosh." Byrd gave lengthy explanations of these matters on the stand and was allowed to refer to and describe the "typed process notes" that he claims the government lost or removed from his files. Even if such notes existed, it is unlikely that they would have changed the jury's verdict. Byrd's now-deceased witnesses would have testified as to statements Byrd made to them about his "reverse sting," a theory the jury heard about at length and chose to disregard.

22

burden of proof for a due process violation, we reject his claim of improper pre-indictment delay.

## Motion to Suppress

Byrd argues that the evidence seized from his home should have been suppressed because the search warrant sought items as to which there was no probable cause. In determining whether probable cause exists to order a search, a magistrate must make a practical, common-sense decision as to whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place. United States v. Peden, 891 F.2d 514, 518 (5th Cir. 1989). We hold that the warrant in this case was supported by probable cause. When Agent Schearer sought the warrant to search Byrd's home, the totality of the circumstances indicated that (1) Byrd had been accused of abusing his position of trust as a psychiatrist by sedating and sexually molesting a child, (2) Byrd had access to children on a regular basis (he was treating young male patients who sometimes stayed at his home, and he was attempting to adopt a young child), (3) Byrd had stated that he had an interest in pre-teen homosexual and heterosexual activity and sadomasochism, and (5) Byrd had ordered two videotapes that he knew depicted children aged 5 to 14 engaging in oral and anal sex with each other and an adult. To an expert investigator, these facts indicated that Byrd's residence likely contained other child pornography materials or evidence of pedophilic activity. Even though the initial complaint of sedation and abuse that prompted Schearer to target Byrd was

23

ultimately dropped with no finding of wrongdoing, this fact does not invalidate the warrant. Schearer testified at the state suppression hearing that even if he had known that the state investigation into the incident had been closed, he would not have discontinued the sting. Schearer stated that it was possible that the state investigation might not have been pursued properly, and that he relied on Byrd's positive responses to the sting correspondence in deciding to continue his own investigation and seek a search warrant after Byrd ordered the child pornography videotapes. We hold that the district court did not reversibly err in denying Byrd's motion to suppress.

## Sentence

Because the crime in this case occurred before November 1, 1987, the federal Sentencing Guidelines do not apply. UNITED STATES SENTENCING COMMISSION GUIDELINES MANUAL, Ch. 1, Pt. A (Nov. 1993). Byrd complains that his sentence of 10 years and a $65,000 fine was "unfair, biased and unconstitutional," and that the judge unfairly sentenced him as a child molester. However, the sentence is within the statutory range set out in 18 U.S.C. § 2252(a)(2), which allows a $100,000 fine and incarceration for up to of 10 years. In a pre-Sentencing Guidelines case, the appellate court will generally not review the severity of a sentence imposed within statutory limits. United States v. Juarez-Ortega, 866 F.2d 747, 748 (5th Cir. 1989). The trial court stated its reasons for assessing the maximum sentence, noting the evidence of sexual and physical abuse of children and pointing out that the Sentencing Guidelines would have

24

provided for an upward adjustment for such relevant conduct. We will not disturb the trial court's decision to sentence Byrd to the maximum statutory term based on the information properly admitted at trial and a psychiatric report[14] ordered by the court as part of Byrd's presentence investigation. We find no basis to reverse Byrd's sentence.

### CONCLUSION

For the reasons stated above, we AFFIRM Bryd's conviction and his sentence.

---

[14]The psychiatric report concludes that Byrd is a pedophile and that there is a significant risk that Byrd would continue his abusive behavior toward children if released. The report also states that Byrd suffers from a severe personality disorder that warps his sense of moral values, and that any attempted treatment of Byrd would likely be unsuccessful because Byrd rationalizes and denies his pedophilia, and because pedophilia is very difficult to treat even with a highly motivated patient. Nevertheless, the trial court ordered Byrd to be incarcerated in a facility that offers sex offender treatment.