# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**Misc. Dkt. No. 2016-10**

———————————

**UNITED STATES**
*Appellant*

**v.**

**Edzel A. MANGAHAS**
Lieutenant Colonel (O-5), U.S. Air Force, *Appellee*

———————————

Appeal by the United States Pursuant to Article 62, UCMJ

Decided 4 April 2017

———————————

*Military Judges:* Brendon K. Tukey (arraignment); Joseph S. Imburgia.

*GCM convened at Hill Air Force Base, Utah.*

*For Appellant:* Major G. Matt Osborn, USAF (argued); Colonel Katherine E. Oler, USAF; Gerald R. Bruce, Esquire.

*For Appellee:* Terri R. Zimmerman, Esquire (argued); Major Johnathan Legg, USAF; Jack B. Zimmerman, Esquire.

Before DUBRISKE, HARDING, and C. BROWN, *Appellate Military Judges.*

Judge HARDING delivered the opinion of the Court, in which Senior Judge DUBRISKE and Judge C. BROWN joined.[1]

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

———————————

---

[1] Senior Judge Dubriske participated in this decision prior to his reassignment.

HARDING, Judge:

A single charge and specification of rape in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920, alleged to have occurred in February of 1997, was preferred against Appellee on 28 October 2015.[2] Finding the pre-preferral delay in this case violated the Due Process Clause of the Fifth Amendment,[3] the military judge granted Appellee's motion to dismiss the charge with prejudice. The Government filed an interlocutory appeal under Article 62, UCMJ, 10 U.S.C. § 862, challenging the military judge's ruling. The Government avers: (1) that certain aspects of the military judge's findings of fact were clearly erroneous; (2) that the military judge applied the incorrect legal standard for when a pre-preferral delay violates Fifth Amendment due process; and (3) that the military judge erroneously concluded the pre-preferral delay in excess of 18 years was egregious and that the death of a potential witness resulted in actual prejudice to Appellee. We conclude the military judge abused his discretion in finding actual prejudice and thus grant the Government's appeal.[4]

## I. BACKGROUND

In February 1997, Appellee and DS, the alleged victim, were cadets attending the United States Coast Guard Academy (USCGA) in New London, Connecticut. Although DS made her allegation against Appellee known to legal and other USCGA officials prior to her graduation in May 1998, there is nothing in the record to directly establish or even imply that any USCGA official or agency initiated an investigation of DS's sexual assault claim. Coast Guard Captain (CAPT) TM, the USCGA staff judge advocate from 1994 to 1998, recalled that he became aware of DS's sexual assault claim after reviewing a written statement she provided for a separate sexual assault investigation. Specifically, DS provided a written witness statement for a joint investigation conducted in early 1998 by the Coast Guard Investigative Service (CGIS) and the Connecticut State Police into an alleged off-installation sexual assault of another female cadet by another male cadet. DS reported in her witness statement that she overheard what she believed to be sexual activity accompanied by someone crying in the bedroom next to the one she was in. She described

---

[2] The specification reflects the version of the punitive article in effect prior to 1 October 2007 and reads: "in that [Appellee] did, at or near the United States Coast Guard Academy, Connecticut, between on or about 1 February 1997 and on or about 28 February 1997, rape [DB], then known as [DS]."

[3] U.S. CONST. amend V.

[4] We heard oral argument in this case on 24 January 2017.

that while overhearing this activity she was "in a state halfway between being fully awake and dreaming." She further wrote that she remembered her dream of the two cadets in the adjacent room "and then the dream turning into me and *the guy who raped me last year."* (Emphasis added) DS did not identify Appellee as her attacker in this statement.

According to CAPT TM, he met with DS prior to her graduation from the USCGA in May 1998 to discuss what she meant by "the guy who raped me last year" in her written statement. At the preliminary hearing for this case, CAPT TM explained that during that meeting DS told him about a sexual assault committed by Appellee against her in her dorm room in February 1997. According to CAPT TM, however, DS did not want to go forward with a sexual assault prosecution at that time and therefore his office did not pursue an investigation, consider preferral of a charge, or explore referral of the allegation to a civilian jurisdiction.[5] Over 16 years passed before DS again spoke with military investigative or prosecutorial authorities about the alleged 1997 sexual assault by Appellee.

In January 2014, DS reported to the Department of Veterans Affairs (VA) that Appellee had raped her in 1997. DS was subsequently interviewed by CGIS on 5 October 2014.[6] In addition to providing details about the sexual assault, she also recounted to whom she had reported it while still a cadet at USCGA. Among those persons is PM, a former USGCA cadet counselor. DS recalls that she met with PM within a month of the alleged sexual assault. According to DS, PM recommended she not continue counseling for the sexual

---

[5] CAPT TM knew that as part of an alternate disposition for a separate and unrelated allegation of sexual misconduct Appellee had graduated from the USCGA in the summer of 1997 but without a commission from the Coast Guard. By the spring of 1998 when CAPT TM recalls speaking to DS, he states he was unaware Appellee had been commissioned in the United States Air Force and assumed Appellee was a civilian. CAPT TM thus believed at the time that personal jurisdiction over Appellee for a military prosecution was lacking and that sole jurisdiction would be with civilian authorities.

[6] The record does not establish precisely what the impetus was for the interview on 5 October 2014. There is evidence that DS made her claim of rape in January of 2014 in conjunction with a visit to the Department of Veterans Affairs (VA). This might support an inference that the VA forwarded this information to the Coast Guard Investigative Services for review or that DS independently made contact with investigators. There is also evidence in the record that the Coast Guard was reviewing the disposition of all sexual assault claims at the Coast Guard Academy made in a period to include 1997 to 1998. Such a review may have included DS's 1997 claim but the record is silent on that point.

assault because, to the extent she was seen as having a mental health issue, this could negatively impact her prospects for commissioning as an officer. CAPT TM, who knew PM in her capacity as a cadet counselor, expressed doubt at the preliminary hearing that PM would have ever attempted to dissuade a sexual assault victim from obtaining counseling services. PM passed away on 23 March 2016 without ever being questioned about a counseling session with DS regarding the alleged sexual assault and any recommendations she made.

Appellee claims, and the military judge concluded, that the unavailability of PM to testify causes actual prejudice to Appellee. As is further discussed below, we disagree and, given this record, do not find actual prejudice.

Appellee filed multiple pretrial motions to dismiss the Charge and its Specification arguing, *inter alia*: (1) a violation of the statute of limitations, (2) a violation of his speedy trial rights under the Sixth Amendment[7] as well as Rule for Courts-Martial (R.C.M.) 707, and (3) a violation of his Fifth Amendment due process rights predicated on prejudicial and egregious pre-preferral delay that is the subject of this appeal. Appellee was arraigned on 14 June 2016. The general court-martial reconvened on 29 July 2016 at which time the military judge heard oral argument on the motions to dismiss.

The military judge issued written rulings on 2 August 2016 denying the motions to dismiss for alleged violations of the statute of limitations,[8] the R.C.M. 707(a) 120-day speedy trial clock, and the Sixth Amendment right to speedy trial. The military judge, however, found that the death and resultant unavailability of PM to impeach the credibility of DS caused actual prejudice to Appellee. Further, finding that the "[G]overnment produced no evidence of a justifiable reason for the delay" of "19 years, 4 months, and 13 days from the first date of the charged offense of rape" to the date of arraignment, he concluded that the Government's pre-preferral delay was "egregious." Finding a violation of the Fifth Amendment Due Process Clause, he granted Appellee's motion to dismiss the Charge and its Specification with prejudice.

Following timely notice of appeal, the Government requested review of the following issue:

> WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION IN DISMISSING THE CHARGE AND SPECIFICATION

---

[7] U.S. CONST. amend. VI.

[8] Under the version of Article 120, UCMJ, in effect at the time of the alleged rape offense, death was an authorized punishment and therefore in accordance Article 43(a), UCMJ, 10 U.S.C. § 843(a), the charge and specification in this case "may be tried and punished at any time without limitation."

WITH PREJUDICE BASED ON A DUE PROCESS VIOLA-
TION OF THE FIFTH AMENDMENT.

## II. JURISDICTION AND STANDARD OF REVIEW

This court has jurisdiction to hear this appeal under Article 62(a)(1)(A), UCMJ, which authorizes the Government to appeal "[a]n order or ruling which terminates the proceedings with respect to a charge or specification" in a court-martial where a punitive discharge may be adjudged.

Because this issue is before us pursuant to a Government appeal, we may act only with respect to matters of law. Article 62(b), UCMJ. We may not make findings of fact, as we are limited to determining whether the military judge's factual findings are clearly erroneous or unsupported by the record. *United States v. Lincoln*, 42 M.J. 315, 320 (C.A.A.F. 1995). "When a court is limited to reviewing matters of law, the question is not whether a reviewing court might disagree with the trial court's findings, but whether those findings are 'fairly supported by the record.'" *United States v. Gore*, 60 M.J. 178, 185 (C.A.A.F. 2004) (quoting *United States v. Burris*, 21 M.J. 140, 144 (C.M.A. 1985)). We review de novo any conclusions of law. *Chatfield*, 67 M.J. at 437. "A military judge abuses his discretion when (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) . . . incorrect legal principles were used; or (3) . . . his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)).

While we accord substantial deference to a military judge's factual findings, whether the pre-preferral delay violated an accused's Fifth Amendment due process rights is a legal question that we review de novo. *See, e.g., United States v. Kalbflesh*, 621 Fed. Appx. 157, 158 (4th Cir. 2015); *United States v. Vaughn*, 444 Fed. Appx. 875, 878 (6th Cir. 2011).

## III. DISCUSSION

An accused's primary protection against unreasonable delay by the government in bringing charges is the statute of limitations. *United States v. Marion*, 404 U.S. 307, 322 (1971). Still, the Due Process Clause of the Fifth Amendment may also provide protection against onerous pre-preferral delay. *Id.* But to prevail on a Fifth Amendment due process claim predicated on pre-preferral delay, an accused must show: (1) "egregious or intentional tactical delay" on the part of the government; and (2) that he suffered actual prejudice as a result of the delay. *United States v. Reed*, 41 M.J. 449, 452 (C.A.A.F. 1995).

## A. Egregious or Intentional Delay

The first prong focuses on the reasons for the delay. The Government urges that to satisfy this first prong, Appellee must show *intentional* government delay to gain an unfair tactical advantage or for some other bad-faith motive. This position is consistent with precedent from several federal circuits. *See, e.g., United States v. Byrd*, 31 F.3d 1329, 1339 (5th Cir. 1994); *United States v. Hoo*, 825 F.2d 667, 671 (2d Cir. 1987); *United States v. Ismaili*, 828 F.2d 153, 167 (3d Cir. 1987). *But see, e.g., Jones v. Angelone*, 94 F.3d 900, 904 (4th Cir. 1996) (holding once a defendant proves actual prejudice resulting from pre-indictment delay, the court then balances the defendant's prejudice against the government's justification for the delay).

Adopting the "intentional delay" position would make short work of this case, as both parties concede that there was no intentional delay. But this position appears to us to be inconsistent with our superior court's holding that the delay must be "egregious *or* intentional." *Reed*, 41 M.J. at 452 (emphasis added). While military courts have had little opportunity to further define "egregious," our superior court's use of the disjunctive plainly connotes something in addition to "intentional"—that there is some level of government culpability for delay short of intentional, bad-faith actions that nonetheless meets this prong.

Such a reading is, we believe, consistent with precedent from the United States Supreme Court. In *United States v. Marion*, the Court endorsed a government concession that "the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay . . . caused substantial prejudice to appellees' rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." 404 U.S. 307, 324 (1971). But the Court declined to establish a precise test or legal standard for when other government delays resulting in actual prejudice violate due process. *Id.* ("[W]e need not, and could not now, determine when and in what circumstances actual prejudice resulting from pre-accusation delays requires the dismissal of the prosecution."). *See also*, *United States v. Lovasco*, 431 U.S. 783, 796–97 (1977) ("In *Marion* we conceded that we could not determine in the abstract the circumstances in which preaccusation delay would require dismissing prosecutions. 404 U.S. at 324. More than five years later, that statement remains true. Indeed, in the intervening years so few defendants have established that they were prejudiced by delay that neither this Court nor any lower court has had a sustained opportunity to consider the constitutional significance of various reasons for delay.").

.

A more recent explanation of protections against delay is also illuminating:

> Criminal proceedings generally unfold in three discrete phases. First, the State investigates to determine whether to arrest and charge a suspect. Once charged, the suspect stands accused but is presumed innocent until conviction upon trial or guilty plea. After conviction, the court imposes sentence. There are checks against delay throughout this progression, each geared to its particular phase.

> In the first stage—before arrest or indictment, when the suspect remains at liberty—statutes of limitations provide the primary protection against delay, with the Due Process Clause as a safeguard *against fundamentally unfair prosecutorial conduct. United States v. Lovasco,* 431 U.S. 783, 789 [ ] (1977); see *id.*, at 795, n. 17 [ ] (*Due Process Clause* may be violated, for instance, by prosecutorial delay that is "tactical" or "*reckless*" (emphasis added, internal quotation marks omitted)).

*Betterman v. Montana* 136 S. Ct. 1609, 1613 (2016) (emphasis added, quotation marks omitted)).

We thus decline to grant the Government's appeal on the basis that Appellee failed to demonstrate that the pre-preferral delay was an intentional, bad-faith tactic and instead grant it by finding a lack of actual prejudice.

**B. Actual Prejudice**

In meeting the burden to prove actual prejudice, speculation is not sufficient. *Reed*, 41 M.J. at 452. The "possibility of prejudice inherent in any extended delay: that memories will dim, witnesses become inaccessible, and evidence lost" is not sufficient to demonstrate that an accused cannot receive a fair trial. *Marion,* 404 U.S. at 326. Furthermore, "conclusory allegations of prejudice, otherwise unsupported in the record, do not constitute valid grounds for dismissal." *Reed*, 41 M.J. at 452 (quoting *United States v. Comosona*, 614 F.2d 695, 697 (10th Cir. 1980)). Prejudice may be demonstrated by showing: "(1) the actual loss of a witness, as well as 'the substance of their testimony and the efforts made to locate them,' or (2) the loss of physical evidence." *Id.* (quoting *United States v. Tousant,* 619 F.2d 810 (9th Cir. 1980)) (internal citations omitted). Finally, the prejudice must be a substantial prejudice to an Appellee's rights to a fair trial to the point where it "would impair the ability to mount an effective defense." *Reed,* 41 M.J. at 452 (quoting *Lovasco*, 431 U.S. at 795 n.17.

In his written ruling, the military judge found, "In this credibility only case, the death of the cadet counselor, Ms. [PM], causes actual prejudice." In order

to assess whether that is the case, it is necessary to review the record and determine: (1) what the substance of PM's trial testimony would have been, and (2) whether Appellee is able to mount an effective defense without that trial testimony.

### 1. Substance of PM's Testimony

We note at the outset that PM never made a written statement about her counseling session with DS, that PM was never interviewed by any investigator or counsel for either side about the counseling session, and that there were no records or notes of the counseling session itself. The exclusive source as to the substance of the interactions between DS and PM is DS herself. Given these circumstances, it is inherently an exercise in speculation to determine whether PM would have recalled, credited, or rebutted the details of the counseling session as provided by DS. Notwithstanding this significant limitation, the following examines the record established below to the extent it describe this one-time counseling session between DS and PM.

During the interview conducted by CGIS on 5 October 2014, in addition to alleging that Appellee sexually assaulted her in her barracks room in February 1997, DS provided a chronology of whom she told about it. PM was one of the people to whom DS stated she reported the sexual assault.[9] In addition to the CGIS interview, there are three undated, unsigned, type-written statements offered during motion practice that describe the assault and actions taken by DS afterwards that are each on their face purportedly authored by DS prior to her 1998 graduation from USCGA.[10]

According to DS, she had decided not to report the alleged rape immediately for purposes of an investigation but desired to "at least get the fact that what happened to me wasn't okay." DS describes this as her impetus to meet with PM. Two of the three undated, unsigned, type-written statements purportedly

---

[9] DS also claimed to have told fellow female cadet, now Commander SH, the morning after the alleged assault.

[10] As part of a Coast Guard review of the handling of sexual assault allegations at USCGA, a box marked "property of GS" was located at the USCGA law library. GS was a judge advocate assigned at the USCGA in the late 1990s to whom DS claims to have reported the sexual assault in the spring of 1997. She says that she provided him a written statement. The box contained three type-written, unsigned, and undated statements describing the alleged sexual assault which on their face purport to be statements of DS. The record before us does not establish whether DS affirmatively identified these statements as prepared by her while a cadet at the USCGA and provided to the USCGA legal office.

authored by DS contain the following paragraph describing her interaction with PM:

> I also talked to one of the cadet counselors, [PM], about the inci-dent. I had used [Appellee's] name, at least his first name. I said that I did not want to come forward with an investigation due the treatment of [sic] the Corps and Administration to the fe-males who do come forward with having been raped.

In her October 2014 interview with CGIS, DS provided additional details about what she recalled PM telling her and specifically that PM recommended she not continue counseling.

> . . . I went to Cadet Counseling and met with her once . . . I can't remember her last name; I think it was "M[ ]." And she was like, "Well, if you continue, this could look bad, because they could say that you have a mental health issue, and you may not be, you know, be able to be commissioned." So she recommended that I don't continue counseling. And so I didn't go any further with that.

We note here that in his findings of fact the military judge found that "DS claimed in her 2014 interview with CGIS that [PM] told her *not to pursue the rape allegation* when she was still a cadet at the USCGA." (Emphasis added). Having carefully reviewed the record before us, we note that DS asserts PM's recommendation was to not continue *counseling*. DS made no assertion that PM told her not to pursue a rape allegation. We therefore conclude that the military judge's finding of fact that DS claimed that PM told her not to pursue the rape allegation is unsupported by record and therefore clearly erroneous. He later marshals this erroneous finding of fact to buttress his legal conclusion of actual prejudice.

In support of the contention that the substance of PM's testimony would in fact rebut DS's claim that she recommended that DS discontinue counseling for the sexual assault, the military judge referenced the Article 32 testimony of CAPT TM.[11] The military judge provided the following analysis in his writ-ten ruling:

> DS claims that [PM] told her not to pursue the rape case. DS also said that CAPT [TM] told her not to pursue the rape case. CAPT [TM] said he never told DS not to pursue the allegation, and that [PM] would have never done so either, adding that [PM]

---

[11] As noted, the military judge erroneously framed this as a recommendation not to pursue a rape case. Notably, CAPT TM's testimony addressed the counseling issue.

has established a support group for cadets who were victims of sexual assault and that [PM] has little tolerance for sexual misconduct. He added that [PM] was at the forefront of eliminating sexual assault on college campuses in the 90s, and that [if] DS told him and [PM] that she was raped, the two of them would never have let [Appellee] leave USCGA.

The military judge, however, stopped short of making an express finding of fact with regard to what the substance of PM's testimony would actually be. Instead, he characterized the impact of the unavailability of PM as a witness on Appellee's ability to mount an effective defense as follows.

Whether DS has an MRE 608(c) motive to fabricate to obtain a better disability rating with the VA when she went there in 2014 to report this incident to them, and whether DS may have asserted to the VA that she was told by CAPT [TM] and [PM] not to go forward in an effort to explain, for the purposes of increased VA benefits, why her rape accusation was never adjudicated, is a valid defense theory the accused can no longer explore because there is no way to adequately rebut DS's accusations regarding PM.

As noted above, the record does not support a claim by DS that PM recommended that she not go forward with a rape prosecution. The accusation against PM that the military judge found critical for Appellee to rebut is not supported by the record in the first place. Regardless, as noted above, speculation is unavoidable in determining what the substance of testimony would be. One could, relying on the testimony of CAPT TM, find it more likely that PM recommended counseling rather than recommend against it.

**2. Ability to Mount an Effective Defense without PM**

The case for actual prejudice predicated on the military judge's unsupported finding of fact may be summed up as this: were PM to testify, she would flatly deny telling any sexual assault victim, to include DS, not to pursue an allegation of sexual assault. Furthermore, depending how the evidence was put on at trial, this testimony might serve to undermine explanations provided by DS in 2014 to the VA and CGIS as to why she did not press her case while she was still a cadet at USCGA. Arguably, DS felt compelled to provide explanations in 2014 as to why she did not immediately report the sexual assault to law enforcement or express a clear desire to go forward while still a cadet at USCGA. If PM had recommended that DS not pursue the rape case, as the military judge mistakenly found DS had claimed, that would provide an understandable explanation. Conversely, were PM to utterly deny she made such a recommendation and was found credible on that point, that testimony would

not only impeach DS by contradiction, but also suggest a motive by DS to fabricate. The motive to fabricate would be rooted in pursuing a better disability rating from the VA and could extend to DS engaging in revisionist history as to some of the details of what she said and did in 1997–1998 with regard to the alleged sexual assault and to the veracity of the alleged assault itself. But these arguments lose some of their weight as DS did not claim that PM told her not to pursue the rape allegation. Even so, it is Appellee's contention that PM would have directly rebutted DS's claim that PM recommended DS discontinue counseling and that such rebuttal would have the same detrimental impact on the credibility of DS. While it is possible that it might have some impact, this conclusion remains speculative.

Furthermore, PM's unavailability does not preclude exploring or presenting evidence of a defense theory that DS fabricated a rape claim in order to obtain a better disability rating with the VA. Appellee is certainly able to cross-examine DS as to her motivations for reporting the sexual assault to the VA and establish a motive to fabricate and attribute false statements to CAPT TM and PM. Appellee can call CAPT TM as a witness to directly rebut her claims about what he told her. As for PM, CAPT TM could also testify to some predicate facts about PM to support an inference that PM would not have recommended that DS not pursue counseling. The military judge himself, when discussing the loss of an opportunity for Appellee to interview PM and ask "whether [she] discouraged DS from proceeding forward with her case" as alleged by DS, found such discouragement by PM "unlikely." We note that the military judge made this finding without ever hearing from PM.

Returning to the two-prong analysis that we laid out for examining actual prejudice in this case, we determine as a matter of law that Appellee has not established actual prejudice.

First, the actual substance of what PM's trial testimony would be is speculative. Given that DS presented herself to PM with no intent to report the rape, rooted in concerns over how she would be treated, it is a reasonable expectation that PM would have addressed those concerns in some fashion. Whether she would have attempted to disabuse DS of those concerns or whether she validated them somewhat by acknowledging the challenges that the criminal process brings to any victim or the reality that certain mental health diagnoses could create issues of suitability or fitness for military service, either course of action is certainly plausible. While a counselor might not view such a discussion as a recommendation against counseling, someone in DS's shoes who already has those concerns may well have perceived it that way. Regardless, the point is that the precise contours and context of PM's unavailable testimony is highly speculative.

11

Further, even assuming that PM were to directly rebut DS, the absence of that testimony, as discussed above, does not deny Appellee the ability to mount an effective defense. In addition to the ability to raise the VA disability benefits as a motive to fabricate, Appellee has at least two witnesses that this court is aware of who can impeach DS's credibility. First is CAPT TM, especially as to her account of how she reported and when she did so. Second is Commander SH who, contrary to DS's assertion, denies that DS ever told her about being sexually assaulted. Finally, in assessing how the absence of PM's testimony potentially impacts Appellee's ability to mount a defense, we note that an obvious import of PM's unavailable testimony is that DS made a complaint to a USCGA official within weeks of the alleged sexual assault. "Fresh complaint" evidence or evidence of reporting a sexual assault close in time has often been viewed as corroborative of the complaint itself. PM's potential testimony, in addition to possibly addressing a recommendation regarding continued counseling, would also potentially establish that DS reported the sexual assault to a USCGA official within the same month. Further, if Appellee were to put on evidence of a motive to fabricate the sexual assault to the VA, then any details that DS provided PM about the sexual assault itself may be admissible for substantive purposes as a prior consistent statement under Mil. R. Evid. 801(d)(1)(B). Perhaps what this best illustrates is the difficulty in assessing actual prejudice before the case is even tried.

## IV. CONCLUSION

The appeal of the United States under Article 62, UCMJ, is **GRANTED**. The military judge's ruling to grant the defense motion to dismiss is **VACATED**. The record is returned to the Judge Advocate General for remand to the military judge for action consistent with this opinion.

FOR THE COURT

LAQUITTA J. SMITH
Appellate Paralegal Specialist