UNITED STATES of America,
Appellee,

v.

Matthew Adam BRAND, also known as
Tempoteech, Defendant–Appellant.

Docket No. 05–4155–CR.

United States Court of Appeals,
Second Circuit.

Argued: May 17, 2006.

Decided: Oct. 19, 2006.

Alexander H. Southwell, Assistant United States Attorney (Michael J. Garcia, United States Attorney for the Southern District of New York, on the brief; Marshall Camp, Assistant United States Attorney, and Kevin R. Puvalowski, Assistant United States Attorney, of counsel), New York, NY, for Appellee.

Colleen P. Cassidy, Federal Defenders of New York, Inc., Appeals Bureau, New York, NY, for Appellant.

Before MINER, WESLEY, and FRIEDMAN,* Circuit Judges.

WESLEY, Circuit Judge.

■ This case requires careful consideration of the affirmative defense of entrapment. Under the entrapment doctrine, "[g]overnment agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." *Jacobson v. United States,* 503 U.S. 540, 548, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992). If the government undertakes such measures, the "stealth and strategy" of particular criminal investigations can, under certain circumstances, become "as objectionable police methods as the coerced confession and the unlawful search." *Sherman v. United States,* 356 U.S. 369, 372, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958).

The entrapment doctrine recognizes that it is necessary (and indeed, appropriate) for the police to act affirmatively in attempting to prevent the commission of crimes. " 'Criminal activity is such that

---

* The Honorable Daniel M. Friedman, Circuit Judge, United States Court of Appeals for the Federal Circuit, sitting by designation.

stealth and strategy are necessary weapons in the arsenal of the police officer.'" *United States v. Russell,* 411 U.S. 423, 434, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973) (quoting *Sherman,* 356 U.S. at 372, 78 S.Ct. 819). While the Supreme Court has recognized that "a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal," *Sherman,* 356 U.S. at 372, 78 S.Ct. 819, the application of the entrapment defense has sharply divided the Supreme Court on a number of occasions. *See Lopez v. United States,* 373 U.S. 427, 434, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963) (collecting cases).

In the instant case, defendant-appellant Matthew Adam Brand ("Brand") claims that he was an "unwary innocent" and that the government induced him to commit the crimes for which he was charged and convicted: traveling across state lines for the purpose of engaging in illegal sexual activity with a minor and attempting to entice a minor to engage in illegal sexual activity. He also contends that the district court erred in admitting images of child pornography, found on his computer, as evidence of his intent to commit the crimes or his predisposition to do so. Lastly, Brand contests the sufficiency of the government's proof with regard to enticement, as well as several aspects of the district court's jury instructions. We hold that, even assuming Brand established government inducement, he cannot succeed on his entrapment defense. The government provided sufficient evidence for the jury to conclude that the prosecution had established that Brand was predisposed to commit the charged crimes. We also hold that the district court did not err in admitting images of child pornography as evidence of Brand's intent or his predisposition. Further, we reject Brand's challenges to the sufficiency of the enticement evidence and

the jury instructions. Accordingly, we affirm the judgment of the district court.

### BACKGROUND

On June 9, 2004, the government filed a two-count indictment against Brand. Count One charged Brand with traveling from New Jersey to New York "for the purpose of engaging in sexual acts with an individual he believed was 13 years old," in violation of 18 U.S.C. § 2423(b). Section 2423(b) provides:

A person who travels in interstate commerce or travels into the United States, or a United States citizen or an alien admitted for permanent residence in the United States who travels in foreign commerce, for the purpose of engaging in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both.

18 U.S.C. § 2423(b). Count Two charged Brand with using a computer, the Internet, and a telephone "to entice an individual he believed was 13 years old to engage in a sexual activity in the State of New York and elsewhere," in violation of 18 U.S.C. § 2422(b). Section 2422(b) provided:

Whoever, using the mail or any facility or means of interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title and imprisoned not less than 5 years and not more than 30 years.

18 U.S.C. § 2422(b).[1]

## I. Brand's Internet Chats With "Sara" and "Julie"

On the night of January 10, 2004, Brand, then a thirty-six-year-old voice instructor from New Jersey, logged onto America Online's ("AOL") instant messenger using his screen name, "Tempoteech," and entered a chat room named "I Love Older Men."[2] In the chat room, Brand encountered "Sara," who used the screen name "Xxxxpartygurlooo" and whom Brand believed was a thirteen-year-old girl from Long Island. In reality, "Sara" was Ms. Stephanie Good, a private citizen who had previously assisted the Federal Bureau of Investigation ("FBI") in several child exploitation investigations.

Shortly after midnight on January 10th, Brand initiated contact with "Sara" by sending her an instant message. In this first chat, Brand asked "Sara" if she was single and could date and whether she liked "older guys." He also suggested meeting in Manhattan. One week later, on January 17th, Brand again contacted "Sara" via instant messenger. The message began, "hi sara its matt again/ remember me 36 single from jersey." During this second conversation, Brand and "Sara" discussed the logistics of meeting for singing lessons, as well as the possibility of "Sara" modeling. Brand suggested that they could meet at the Port Authority Bus Terminal in Manhattan and that he could take her back to his house in New Jersey or, in the alternative, that she could take the bus to his house and he would reimburse her for the bus fare.

Three days later, on January 20th, Brand once again contacted "Sara" via instant messenger. In addition to discussing their plans for singing lessons, Brand wrote that he and "Sara" were a "perfect match" and that "we might like each other a lot." During the course of the conversation, Brand eventually asked "Sara" to be his "girlfriend" and then asked if he could hug "Sara" when he saw her and "maybe [give her] a kiss." Brand stated "i only want to kiss you" and later announced that "if you still love me when your [sic] 18 we could get married." Brand and "Sara" also discussed what "Sara" would tell her mother about coming to Brand's place, and Brand advised: "do what you have to."

Ms. Good, the private citizen posing as "Sara," later testified that, when she finds someone on the Internet whom she believes is interested in a sexual relationship with a young girl, she introduces the suspect to her friend "Julie." In reality, "Julie" was Special Agent Austin Berglas, an FBI agent working in an undercover capacity on the Internet by posing as a thirteen-year-old girl who lives in New York. Based on her three Internet chats with Brand, Ms. Good decided that she should turn Brand over to Agent Berglas. Ms. Good told Berglas that she believed that Brand was interested in meeting an underage girl for the purpose of sexual activity, and Berglas agreed with Good's assessment.

---

1. § 2422(b) was amended July 27, 2006, changing the potential term of imprisonment from "not less than 5 years and not more than 30 years" to "not less than 10 years or for life." Adam Walsh Child Protection Safety Act of 2006, Pub.L. No. 109–248, § 203, 120 Stat. 587, 613 (2006).

2. "Instant messages are real-time communications with others over the internet." *United States v. Brand*, 2005 WL 77055, at *1 n. 2 (S.D.N.Y. Jan.12, 2005). "A screen name is [a] pseudonym adopted by an internet user for purposes of identifying that user when communicating with others over the internet." *Id.* at *1 n. 3.

Consequently, on January 22, 2004, "Sara" initiated a chat session with Brand during which she mentioned her friend "Julie." "Sara" gave Brand Julie's screen name, "julie13nyc," and told Brand that her friend "Julie" likes music and singing and was interested in taking lessons. "Sara" later told Brand on February 1, 2004 that she had been in a car accident and had broken some bones and indicated that she would not be able to meet him for some time.

Meanwhile, on January 23, 2004, one day after "Sara" mentioned "Julie" to Brand, Brand initiated contact with "Julie" by sending her an instant message. Brand and "Julie" discussed the possibility of singing lessons and having "Julie" model in a children's "calendar," in which children "pose with puppets and giant toys like a huge gameboy." Brand indicated that "Julie" should contact him either through an instant message or via e-mail.

Twelve days later, on February 4, 2004, "Julie" sent an instant message to Brand. Within five minutes of the initiation of the conversation, Brand asked "what about your boyfriend[?]" After "Julie" indicated that she did not have a boyfriend, Brand replied: "well thats ok i am single too." Brand then asked "Julie" whether she wanted to date an older man and, when "Julie" responded "yea/ well someone who knows stuff," Brand replied "well i am free." Brand requested that "Julie" send him her picture and, after receiving it, he indicated that "i would be lucky to have a girl like you." Brand proceeded to ask "Julie" out on a date, and "Julie" accepted. "Julie" inquired whether he had ever previously dated anyone her age. Brand responded "never," and when "Julie" asked why, Brand responded "cause no one was ever interested and i could get in trouble."

One week later, on February 11th, Brand sent "Julie" an instant message.

Brand indicated that "i can't wait to take you out," "i would love to have you as a girlfriend," and "i would be honored to date you," and he asked "Julie" to "say you will be my valentine." At trial, Agent Berglas testified that he believed that "by saying, I want you to be my valentine and I want you to be my girlfriend, that to me implied that this individual had the intention of engaging in sex with 'Julie.' " As a result, "Julie" asked Brand whether he would teach her "stuff," and Brand responded "if you would like that/ i would love to." Brand further responded that "we could fool around and explore" and "we could do it all" and indicated that he could show "Julie" "how to be a woman" and "make [her] feel so good." When "Julie" inquired where Brand would show her this "stuff," Brand replied that "we could go to my place [in New Jersey] if you wanted." Brand indicated that he would love to see "Julie" that day. When "Julie" responded that her mother was unlikely to let her go out, Brand suggested meeting on the weekend. Brand and "Julie" made plans to speak by cell phone approximately one hour later.

## II. Brand's Telephone Conversations with "Julie"

During Brand's telephone conversations with "Julie," the FBI enlisted Ms. Good, the same private citizen who had previously posed as "Sara," to play the voice of "Julie" because of Good's skillfulness in imitating the voices of teenage girls. "Julie" called Brand and talked to him using the instructions of Agent Berglas, who communicated with "Julie" via instant messenger. All three telephone conversations between Brand and "Julie" took place on February 11th, the day before the two were scheduled to meet in New York City.

During their first telephone conversation, Brand discussed the logistics of meeting "Julie" the following day. Brand suggested that they meet at the Port Authority. Specifically, he suggested that "Julie" take a taxicab there, where he would wait for her, hold a sign with her name, and pay the cab. Brand also told "Julie" that he could pick her up in his red convertible and that she could "ride in it all summer." Brand hinted that "Julie" should "sneak a call" later that evening "so we can make definite, definite plans so I know if you're comfortable with this or not." "Julie" called back a short time later, and Brand asked her to call back again in fifteen minutes.

When "Julie" called back, Brand confirmed their plan to meet at the Port Authority. "Julie" continued to ask Brand what "stuff" he was going to show her. Brand responded: "Well, what do you want? What do you wanna do? You tell me"; "Don't be shy, whatta you wanna do with me? Tell me"; "I wanna hear you say it, whatta you wanna learn?"; and "Tell me what you want me to do to you, come on … Don't be embarrassed, tell me." At this point, "Julie" responded: "Well, 'cause like I don't know so much, you know like, sex stuff and everything." Brand responded: "So, whatta you wanna learn sexually?"

Brand proceeded to enumerate the sexual acts that he could engage in with "Julie." He asked "Julie" if she wanted him to touch her "breasts" and "crotch," whether she had "nice breasts" and a "nice ass," and whether he should touch her crotch with "my penis," "my fingers," or "my tongue." When "Julie" asked whether it would hurt, Brand said that "maybe using my penis would hurt" because "maybe it's too big and because you're a virgin." Brand assured "Julie" that he wanted to use his penis but told her that he did not have to use it right away because he could use his fingers or tongue instead. Brand continually urged "Julie" to tell him where she wanted him to put his tongue and indicated that it gets him excited if she says it. When "Julie" inquired whether she would "get pregnant or anything," Brand told her that she would not, assuring her that he would use a condom as protection. Brand also admonished "Julie" to not "go learnin' all this stuff that I'm, [sic] that you want me to teach you and then go finding some other man."

During the same conversation, Brand and "Julie" further discussed the logistics of meeting the next day and the plan to have "Julie" "stay over." Brand reiterated that "Julie" could ride in his convertible and promised that he would "even bring a movie so we can watch a movie while we drive." Brand also instructed "Julie" to "check [her] e-mail in the morning just to make sure," but Brand continued to offer assurances that "I'm not changing my mind" and "I'll definitely, definitely be there."

## III. Brand's Meeting with "Julie"

Just after 3:00 a.m. the following morning, February 12th, Brand e-mailed "Julie" and told her that a meeting prevented him from meeting at noon later that day but that "Julie" should "call me when you get home and we can work something out." "Julie" sent Brand an instant 1message just before 8:00 a.m. "Julie" asked Brand if he was still coming and complained "i new u didn't wanna see me." Brand assured her that he was still coming and told her to call him. Bran also mentioned the possibility of taking a vacation with "Julie" in Massachusetts during the coming summer. After "Julie" reiterated that "i wanna do that stuff," Brand responded that "i said yesterday we would do that stuff today

and we will" and that he was already thinking about "kissing and touching" her.

At noon, "Julie" called Brand to see if Brand was still coming and, if so, what time they would meet. Brand proposed meeting at 1:30 p.m. at the Port Authority. Brand then instructed "Julie" to call him back in half an hour, indicating that he would be on his way in the car and could then give her an exact time. When "Julie" called Brand back approximately thirty minutes later, Brand told "Julie" that he would be near the taxicab stand in front of the Port Authority with a sign at 2:00 p.m.

FBI agents set up surveillance at the Port Authority Bus Terminal. After they observed Brand walking along and looking into taxicabs at the taxi stand, Brand was placed under arrest. The FBI agents removed a handwritten sign with "Julie's" name on it from Brand's pocket, as well as three condoms from the glove compartment of Brand's car. The agents also found a number of pictures of young girls in Brand's car, including three suggestive pictures of a young girl lying on a bed holding a large toy video game and standing in front of a mirror holding a large toy toothbrush and tube of toothpaste; there was also a series of autographed modeling "headshots" of young girls.

Brand waived his *Miranda* rights and admitted that he was at the Port Authority to meet someone he believed to be a thirteen or fourteen-year-old girl named "Julie" whom he had met over the Internet. Brand proceeded to make several other admissions. He told the agents that, while he initially talked to "Julie" about voice lessons, the conversation turned to a "sexual nature." He confessed that he had told "Julie" she would not get pregnant because he would use a condom and that he had asked if he could lick "her breast and crotch." He admitted to using the "Tempoteech" screen name to chat over the Internet with other girls as young as ten years old and to engaging in sexually explicit communications with those girls. Brand also admitted that he knew that arranging to meet "Julie" was "wrong and illegal" and that he was afraid of being caught by the police.

Brand told the agents that on the night before the scheduled meeting he had "second thoughts" and had e-mailed "Julie" in order to give himself a possible way out of the meeting. He also asserted that he had been "kind of hoping that Julie wouldn't show up at the Port Authority bus terminal because ... he didn't know what he was actually going to do when she arrived." He indicated that he had come to the Port Authority because he did not want "Julie" standing there alone. He also admitted, however, that he could have told "Julie" that what they were doing was wrong and illegal and cancelled their meeting.

Brand further confessed to receiving and viewing images of child pornography over the Internet and his home computer using his "Tempoteech" screen name. Consequently, after his arrest, the FBI seized Brand's computer. On the computer, agents discovered approximately eighty images of child pornography and child erotica, many of which Brand had deleted and some of which were in temporary files. The majority of the pictures that the police recovered, however, were, or had been, in the same folder, or location on the hard drive of his computer, in which Brand had saved the picture of "Julie."

## IV. The Trial

The district court resolved a number of the government's pre-trial motions. *See United States v. Brand*, 2005 WL 77055 (S.D.N.Y. Jan.12, 2005). The government sought a ruling (1) that images of child erotica and child pornography from

Brand's computer were admissible as direct evidence of the crimes charged; (2) alternatively, that the images were admissible under Rule 404(b) to prove motive, intent, plan, knowledge, and absence of mistake or accident; and (3) that two transcripts of Internet communications between Brand and two other undercover agents posing as 13–year–old girls, "Jenny" and "Mizbonnie," were similarly admissible pursuant to Rule 404(b). *Id.* at *1.

On January 12, 2005, the district court (Leisure, J.) issued a preliminary ruling on one of the government's *in limine* motions. The district court held that the images of child pornography and child erotica were not admissible as direct proof of either of the crimes charged. *Id.* at *3. However, the court concluded that the images were admissible under Rule 404(b) because the government was planning to offer the images "for a permissible purpose other than to show a propensity to commit the crimes charged." *Id.* at *5. The court, noting that "defendant's state of mind [would] likely be a central issue at trial," determined that the images were probative of Brand's intent. *Id.* The court found that "evidence that Brand exhibited an interest in child erotica and child pornography on the internet in the period leading up to the charged

conduct is pertinent to whether he used the internet in an attempt to engage in sexual conduct with 'Julie.' " [3] *Id.* Subsequently, at trial, the district court allowed the government to introduce the sixteen images of child pornography and child erotica from Brand's computer. At that time, the district court also issued a limiting instruction, to which Brand objected, regarding the limited evidentiary purpose of the images.

In ruling on the government's *in limine* motion, the district court also considered the admissibility of two transcripts involving previous instant message communications between Brand and two other undercover agents. In the first transcript, Brand, using the screen name "Tempoteech," chatted with "JennySFV13," an agent posing as a 13–year–old girl from Los Angeles, in the chat room "I Love Much Older Men." *Id.* at *6. Brand asked "Jenny" whether she "like[d] to hold hands" and "kiss" and indicated that they would "have fun." *Id.* He also asked "Jenny" whether she ever traveled to New Jersey and suggested that they could "see the city." The district court found the transcript admissible, concluding that, "[i]n light of the fact that Brand is charged with attempting to persuade a minor to engage in sex acts, this i-chat is sufficiently similar

**3.** The district court found that the images of child erotica and child pornography were admissible "subject to an evidentiary hearing so that the Court may determine the number of images to be admitted and how those images will be presented to the jury." *Brand,* 2005 WL 77055, at *7. On the next day, the district court conducted an evidentiary hearing, and, on the following day, issued a supplemental memorandum order. *See United States v. Brand,* 2005 WL 94849, at *1 (S.D.N.Y. Jan.14, 2005). In the supplemental order, the district court addressed whether the government's proposal to present each juror with a binder of sixteen images and to introduce, upon the jury's request, a CD–ROM containing 140 images, eighty of which involved

child erotica and child pornography, was unduly cumulative. *See id.* After reviewing the government's binder of sixteen images, the court held that the binder would be "a fair and appropriate method for presenting this evidence to the jury" because the number of images was "not exceedingly large" and the presentation of images would "not burden or confuse the jury." *Id.* at *2. However, the court rejected the government's attempt to introduce the CD–ROM. *Id.* The court found that the "140 images on the CD–ROM [are] cumulative of the binder images that will be admitted" and concluded that these additional images "would only serve on the present record to confuse the jury and waste time, without any meaningful benefit." *Id.*

to the charged conduct to permit a reasonable jury to draw from it an inference that Brand was motivated by a sexual intent in his interactions with 'Julie.'" *Id.* At trial, the undercover agent who posed as "Jenny" testified about the details of this chat session and explained that it was his practice not to initiate a second chat or conversations about sex.

However, the district court concluded that the second transcript of a conversation between Brand and an undercover agent was inadmissible. In the second transcript, Brand, again using the screen name "Tempoteech," chatted with "Mizbonnie13," another agent posing as a thirteen-year-old girl. *Id.* The court concluded that, although "the transcript of the 'JennySFV13' i-chat is admissible primarily because of its sexual character, . . . the transcript of the 'Mizbonnie 13' i-chat is not sufficiently relevant, and therefore inadmissible, due to its non-sexual subject matter." *Id.*

Following the government's case-in-chief, which included testimony from Agent Berglas, the defense argued that the government had entrapped Brand into traveling to New York to engage in illicit sexual conduct with "Julie" and attempting to entice "Julie." In addition, Brand called a psychiatrist, Dr. Sasha Bardey, who testified that, based on his training, experience, and his review of the literature, no relationship exists between possessing or viewing child pornography and committing an illegal sexual act against a minor. However, on cross-examination by the government, Dr. Bardey admitted that he had read a study that showed that 83% of individuals arrested for Internet-related sex crimes against minors also possessed child pornography.[4] He also noted that he was not a member of any of the professional societies focused on the treatment of sex offenders and had also not published or presented anything related to the treatment of sex offenders.

Before the government's rebuttal, the district court announced that it would charge the jury with Brand's entrapment defense. The court ruled that Brand had made a sufficient showing of government inducement and, thus, that the burden now shifted to the government to prove Brand's predisposition to commit the charged crimes. The district court therefore allowed the government to introduce evidence on rebuttal, which the court had earlier deemed inadmissible, in order to show Brand's predisposition. Specifically, the government called Detective Sherry Kiszewski, a member of the Buffalo Police Department's sex offense squad, who acted in an undercover capacity as the thirteen-year-old girl "Mizbonnie." Detective Kiszewski testified that, on December 30, 2003, Brand had initiated contact with "Mizbonnie," asked her whether she dated older guys, suggested that she visit him in New Jersey, and offered to pay her bus fare. Detective Kiszewski explained that she had been taught "never to bring the subject of sex up" and that, under her understanding, entrapment included "asking an adult to come and have sex with you or broaching the subject." In addition, the government recalled Agent Berglas and, through him, the district court allowed the government to introduce the CD–ROM containing additional images of child por-

---

4. We note that on cross-examination by the government, Dr. Bardey stated that he had not read a study by Dr. Andres E. Hernandez, a study that demonstrates a connection between possession of child pornography and sexual contact with children. This is presumably the same study that informed the testimony that Michael J. Heimbach, Crimes Against Children Unit, Criminal Investigative Division, FBI, presented to Congress. *See infra* Part II.A.

nography and child erotica found on Brand's computer.

The district court instructed the jury on the nature of Brand's entrapment defense and the limited purpose of the Rule 404(b) evidence. Brand's counsel objected to each set of instructions. The case was submitted to the jury, which ultimately found Brand guilty on both counts. On July 28, 2005, the district court sentenced Brand to the mandatory minimum sentence of 60 months' imprisonment, to be followed by five years of supervised release, and imposed the mandatory $200 special assessment. This appeal followed.

## DISCUSSION

Brand raises four issues on appeal. First, Brand contends that he was entrapped by the government. He argues that the government induced him to commit the offenses of which he was convicted and that the government's evidence was insufficient to establish that he was predisposed to commit these offenses independent of the government's own actions. Second, Brand contends that the district court erred in finding the images of child pornography sufficiently similar to the crimes charged to make the introduction of these images probative of either intent under Rule 404(b) or of predisposition. Third, Brand contends that the government's evidence was insufficient to prove that he attempted to entice a minor to engage in illegal sexual activity in violation of 18 U.S.C. § 2422(b). Fourth, with respect to both his entrapment defense and the district court's evidentiary rulings, Brand asserts that the district court's jury instructions were erroneous and constitute reversible error.

## I. *Entrapment*

"Entrapment is an affirmative defense that requires a defendant to prove by a preponderance of the evidence the government's inducement to commit the crime." *United States v. Williams,* 23 F.3d 629, 635 (2d Cir.1994). If a defendant carries his burden of establishing entrapment, the government can still defeat the defense of entrapment if it can show that a defendant was predisposed to commit the crime. "If a defendant presents credible evidence of government inducement, then the prosecutor must show predisposition beyond a reasonable doubt." *United States v. Bala,* 236 F.3d 87, 94 (2d Cir.2000). Thus, the inquiry centers on: "(1) [whether] the agent induce[d] the accused to commit the offence charged in the indictment; [and] (2) if so, was the accused ready and willing without persuasion and was he awaiting any propitious opportunity to commit the offence." *United States v. Mayo,* 705 F.2d 62, 67 (2d Cir.1983) (quoting *United States v. Sherman,* 200 F.2d 880, 882–83 (2d Cir.1952)).

## A. Inducement

The first element of Brand's entrapment defense requires him to establish that he was induced—in other words, that it was the government, not he, that originated "the criminal design." *Jacobson,* 503 U.S. at 548, 112 S.Ct. 1535. The government argues that Brand has not satisfied this preliminary burden, arguing that Brand's lurking in the chat room "I Love Older Men," as well as his unsolicited contact of "Sara" and "Julie," demonstrate that the government did not "implant in an innocent person's mind the disposition to commit a criminal act." *Id.* Brand disagrees and asserts that he set forth sufficient evidence, including evidence that the government initiated the communication beyond Brand's original offer of voice lessons and that the government constantly turned the discussion to sex and the possibility of meeting to engage in sexual activity. In-

deed, Brand asserts that the district court charged the entrapment theory to the jury because there was "no doubt" that Agent Berglas induced Brand and that the real issue for the jury was Brand's predisposition.

Absent a concession of inducement by the government,[5] a defendant hoping to assert the entrapment defense bears the burden of establishing inducement by a preponderance of the evidence. *See Williams*, 23 F.3d at 635; *see also United States v. Steinberg*, 551 F.2d 510, 513–14 (2d Cir.1977). To satisfy the "relatively slight" burden, the defendant must demonstrate that "the government initiated the crime." *Mayo*, 705 F.2d at 67 (internal quotations and citations omitted). Judge Learned Hand wrote that inducement includes "soliciting, proposing, initiating, broaching or suggesting the commission of the offense charged." *Sherman*, 200 F.2d at 883. Or, put another way, a defendant must establish that "[it was] the prosecution [that] set the accused in motion...." *Id.*

A defendant's burden of proof on inducement should not be treated as a hollow requirement in those cases where the government has not conceded the issue. To satisfy the burden on inducement, a defendant cannot simply point to the government's use of an undercover agent or confidential informant. While " 'stealth and strategy are necessary weapons in the arsenal of the police officer,' " *Russell*, 411 U.S. at 434, 93 S.Ct. 1637 (quoting *Sherman*, 356 U.S. at 372, 78 S.Ct. 819), and "[a]rtifice and stratagem may be employed to catch those engaged in criminal enterprises," *Sorrells*, 287 U.S. at 441, 53 S.Ct. 210 (internal citations omitted), that the government employed either does not nec-

essarily mean that it was the government that " 'initiat[ed] the crime,' " *United States v. Licursi*, 525 F.2d 1164, 1168 (2d Cir.1975) (quoting *U.S. v. Riley*, 363 F.2d 955, 958 (2d Cir.1966)), or "set the accused in motion." *Sherman*, 200 F.2d at 883. Although a defendant's burden of proof on inducement may be relatively easily satisfied, this element of entrapment still must be established.

Much of Brand's conduct in his initial contacts with "Sara" and "Julie"—asking if they "dated" older men, would be his girlfriend, or would pose for pictures—could be seen as preparation for a later sexual encounter. In the words of one witness, Brand was "grooming" the "girls" for later sexual activity.[6] We need not decide the issue, however, because as the government argues, even if Brand was induced, the record nonetheless shows that there was more than ample evidence to demonstrate Brand's predisposition beyond a reasonable doubt to entice minors to have sex with him.

**B. Predisposition**

■ Brand contends that the government's evidence was insufficient as a matter of law to establish that he was predisposed to commit the offense charged independent of the government's actions. Brand contends that *Jacobson*, 503 U.S. 540, 112 S.Ct. 1535, 118 L.Ed.2d 174, is determinative and points out that, under *Jacobson*, predisposition is measured independently of the government's actions. Under this standard, Brand argues, the government did not present any evidence that, in the past, he had either attempted to entice a minor or traveled across state lines to meet underage girls. Brand further maintains that the evidence that the

---

5. *See, e.g., Jacobson*, 503 U.S. at 549 n. 2, 112 S.Ct. 1535; *Salerno*, 66 F.3d at 547.

6. *See infra* Part III.

government did present could not establish predisposition because it either did not involve a discussion of sexual activity or merely suggested "a general inclination to act within a broad range, not all of which is criminal." *Id.* at 550, 112 S.Ct. 1535.

The government argues that the record clearly shows that more than ample evidence exists to demonstrate Brand's predisposition. The government contends that Brand, in asserting that the evidence was not sufficient to establish predisposition, erroneously implies that the Internet chats with "Jenny" and "Mizbonnie" and the images of child pornography found on his computer are the only pieces of evidence. The government points to Brand's communications with "Sara" and "Julie" and his post-arrest statements to the police, each of which, the government maintains, are independently sufficient to establish predisposition. Thus, according to the government, Brand's course of conduct with "Sara" and "Julie," his admissions of explicit chats with other young children, his chat sessions with "Jenny" and "Mizbonnie," as well as Brand's images of child pornography, amply demonstrated Brand's predisposition to attempt to entice and meet a minor to engage in sexual activity.

The Supreme Court has made clear that "Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." *Jacobson,* 503 U.S. at 548, 112 S.Ct. 1535 (citing *Sorrells,* 287 U.S. at 442, 53 S.Ct. 210, and *Sherman,* 356 U.S. at 372, 78 S.Ct. 819). As noted above, "[if] a defendant presents credible evidence of government inducement, then the prosecutor must show predisposition beyond a reasonable doubt." *Bala,* 236 F.3d at 94. Because Brand's argument is "in sub-

stance an attack on the sufficiency of the government's evidence of predisposition," *Salerno,* 66 F.3d at 547, "that evidence must be viewed in the light most favorable to the government, and all reasonable inferences must be drawn in the government's favor," *id.* (citing *United States v. Aulicino,* 44 F.3d 1102, 1114 (2d Cir. 1995)).

We have established that predisposition may be shown by evidence of: "(1) an existing course of criminal conduct similar to the crime for which the defendant is charged, (2) an already formed design on the part of the accused to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement." *United States v. Brunshtein,* 344 F.3d 91, 101–02 (2d Cir.2003) (quoting *Salerno,* 66 F.3d at 547 (internal quotation marks and alteration omitted)). Whether the government has demonstrated predisposition, however, depends to a great degree on the nature and scope of the relevant inquiry into a defendant's predisposition.

Brand relies heavily on the Supreme Court's decision in *Jacobson,* 503 U.S. 540, 112 S.Ct. 1535, 118 L.Ed.2d 174. In that case, over the long span of two-and-one-half years, the government engaged in "repeated efforts," through five fictitious organizations and a bogus pen pal, "to explore [Jacobson's] willingness to break the [ ]law by ordering sexually explicit photographs of children through the mail." *Id.* at 543, 112 S.Ct. 1535. Eventually, Jacobson was arrested after he ordered a copy of "Boys Who Love Boys," a pornographic magazine depicting young boys engaged in various sexual activities. *Id.* at 547, 112 S.Ct. 1535. Although the Court acknowledged that petitioner eventually became predisposed to break the law, the Court concluded that "the Government did not

prove that this predisposition was independent and not the product of the attention that the Government had directed at petitioner." *Id.* at 550, 112 S.Ct. 1535. Applying this rule, the Court rejected any evidence that the government developed "during the course of the investigation." *Id.* The Court subsequently concluded that the government could not establish predisposition because the "sole piece of preinvestigation evidence," petitioner's order and receipt of the Bare Boys magazines, the possession of which was legal when Jacobson obtained them, "merely indicate[d] a generic inclination to act within a broad range, not all of which is criminal" and thus was of "little probative value in establishing predisposition." *Id.*

Because we are bound by the Court's holding in *Jacobson,* Brand is correct in pointing out that the government's reliance on certain evidence of acts that occurred *after* Brand's initial contact with government agents is misplaced. This evidence would not be probative of "petitioner's state of mind *prior* to the commencement of the Government's investigation." *Id.* at 549 n. 2, 112 S.Ct. 1535. However, even under *Jacobson,* the Government can still establish predisposition based on " 'the accused's ready response to the inducement.' " *Brunshtein,* 344 F.3d at 102 (quoting *Salerno,* 66 F.3d at 547). We have recognized this characteristic of predisposition both before and after *Jacobson.*[7]

In *Mayo,* a pre-*Jacobson* case, we noted that "[p]ropensity can be established in many ways, among them proof of . . . 'a willingness to commit the crime for which he is charged as evidenced by the ac-

cused's *ready response to the inducement.*' " 705 F.2d at 68 (quoting *United States v. Viviano,* 437 F.2d 295, 299 (2d Cir.1971) (emphasis in *Mayo* )). Mayo had been convicted previously of "violating the federal firearms law and, as a consequence, was not licensed to deal in modern firearms." *Id.* at 66. An undercover agent offered to purchase a machine gun and other modern weapons from Mayo. *Id.* at 67. We noted that "Mayo jumped at the opportunity." *Id.* Ultimately, we held that the government had established predisposition beyond a reasonable doubt because of "Mayo's ready and unhesitating response to [the informant's] inducement" and his "unhesitating willingness to commit the crimes for which he was convicted." *Id.* at 69. We indicated that, because "[t]he government's evidence of propensity established [Mayo's] unhesitating willingness to commit the offenses charged," *id.* at 73, "[t]his is not a case where 'the Government's deception actually implant[ed] the criminal design in the mind of the defendant,' " *id.* (quoting *Russell,* 411 U.S. at 435–36, 93 S.Ct. 1637 (second alteration in *Mayo* )).

We have also recognized this "ready response" aspect of predisposition in post-*Jacobson* cases. *See, e.g., Salerno,* 66 F.3d at 547–48; *United States v. Harvey,* 991 F.2d 981, 992–93 (2d Cir.1993). In *Harvey,* we noted that "*Jacobson* did not change the law so that when a suspect *promptly* avails himself of a government-sponsored opportunity to commit a crime, that suspect thereafter can successfully claim he was entrapped as a matter of law."[8] 991 F.2d at 993 (citing *Jacobson,*

---

7. In this opinion, we rely mainly on the third prong of *Brunshtein,* which quotes *Salerno,* because that is the path to proving predisposition that the government emphasizes in its argument. However, we note that the other two paths might have been equally viable in

this case. *See Brunshtein,* 344 F.3d at 101–02.

8. Indeed, if this means of showing predisposition—namely, that a defendant promptly availed himself of a criminal opportunity—did

503 U.S. at 550, 112 S.Ct. 1535). Indeed, even in *Jacobson*, the Supreme Court pointed out that "[h]ad the agents in this case simply offered petitioner the opportunity to order child pornography through the mails, and petitioner—who must be presumed to know the law—had *promptly availed* himself of this criminal opportunity, it is unlikely that his entrapment defense would have warranted a jury instruction."[9] 503 U.S. at 550, 112 S.Ct. 1535 (emphasis added) (citing *Mathews v. United States*, 485 U.S. 58, 66, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988)).

Applying this rule in *Harvey*, we held that "[i]t is clear to us that the jury, in this case, was free to conclude from the government's evidence that Harvey's requests for a catalog of material featuring 'younger performers,' 'young performers,' and 'your youngest performers' were oblique requests for child pornography reflecting predisposition beyond a reasonable doubt." 991 F.2d at 992. Harvey made these requests only after the government had sent him a " 'specific interest' response letter," which asked Harvey for his preferences and areas of interest. *Id.* at 984. In response to Harvey's requests, the government mailed him a catalog advertising vid-

eotapes that depicted young girls engaging in sexual activity with men. *Id.* at 985. Despite these facts, we held that "Harvey's prompt acceptance of the government-sponsored invitation to purchase child pornography, as reflected in the order form, provided sufficient evidence for the jury to conclude that the prosecution had proven beyond a reasonable doubt that Harvey was predisposed to commit the crime charged." *Id.* at 992–93. We also found *Jacobson* easily distinguishable:

> Based upon Harvey's *prompt* response to the government's single invitation to him to purchase child pornography, the jury could rationally find that he possessed the requisite predisposition beyond a reasonable doubt. Such was not a permissible inference in *Jacobson* since, in that case, it took over two and one-half years of various governmental efforts directed toward the defendant before he placed an order for child pornography.

*Id.* at 993. We thus made clear that *Jacobson* had not changed the law regarding a suspect who "*promptly* avails himself of a government-sponsored opportunity to

---

not exist, the government, in attempting to show predisposition, might be forced to rely exclusively on past criminal conduct (if any) or other bad acts (if any) that occurred *prior to* when the government "initiated any contact." *See Jacobson*, 503 U.S. at 549 n. 2, 112 S.Ct. 1535. Under such a scheme, a defendant who had established government inducement and who had no prior history would be effectively immune from any possibility of conviction. We do not believe that *Jacobson* requires such a perverse result. *Cf. Jacobson*, 503 U.S. at 557, 112 S.Ct. 1535 (O'Connor, J., dissenting) ("The rule that preliminary Government contact can create a predisposition has the potential to be misread by lower courts as well as criminal investigators as requiring that the Government must have sufficient evidence of a defendant's predisposition *before it ever seeks to contact him.* Surely

the Court cannot intend to impose such a requirement, for it would mean that the Government must have a reasonable suspicion of criminal activity before it begins an investigation, a condition that we have never before imposed."); *Harvey*, 991 F.2d at 991 ("[W]e do not discern that *Jacobson* specifically requires the government to demonstrate that it had some cause, reason, or suspicion prior to making a person the target of an undercover investigation.").

9. Indeed, because Brand promptly availed himself of the opportunity presented, an entrapment jury instruction might not have even been warranted. However, we are not called on to decide whether the instruction should have been given in first place.

commit a crime." [10] *Id.*

Likewise, in *Salerno*, we were confronted with a situation in which a confidential informant ("CI") contacted, at the government's request, defendant DiGirolamo as part of an undercover operation targeting heroin distributors. 66 F.3d at 546. DiGirolamo claimed entrapment, and, on appeal, the government conceded inducement. *Id.* at 547. We pointed out that a defendant is predisposed to commit a crime if he is "ready and willing without persuasion to commit the crime charged and awaiting any propitious opportunity to do so," *Id.* (quoting *Harvey*, 991 F.2d at 992) (internal quotation marks omitted), and that predisposition can be shown by " 'the accused's ready response to the inducement,' " *Id.* (quoting *United States v. Valencia*, 645 F.2d 1158, 1167 (2d Cir. 1980)). We therefore found it determinative that the government introduced evidence that DiGirolamo "readily agreed to the transaction." *Id.* While DiGirolamo attempted to point to evidence that he had been reluctant to be involved in the deal, we noted that there was evidence that DiGirolamo "displayed no such hesitation in his initial discussions with the CI, when the CI first proposed the deal." *Id.* at 548. We also found it significant that whatever reluctance DiGirolamo displayed "quickly evaporated" after DiGirolamo contacted a friend. *Id.* As a result, we held that "there was sufficient evidence to support a jury finding that DiGirolamo was ready willing and predisposed to commit the crime proposed by the CI." *Id.*

Applying the Supreme Court's decision in *Jacobson*, as well as our decisions in *Mayo, Harvey*, and *Salerno*, we have no difficulty concluding that sufficient evidence existed for the jury to conclude beyond a reasonable doubt that Brand was predisposed to travel across state lines for the purpose of engaging in illegal sexual activity with a minor and to attempt to entice a minor to engage in illegal sexual activity. As an initial matter, we note that the manner in which Brand contacted both "Sara" and "Julie"—specifically, in an Internet chat room entitled "I Love Older Men"—does bear on Brand's predisposition. He did not encounter them until he had chosen to log onto a chat room with a very suggestive name. Once in the chat room, Brand believed that "Sara" was a thirteen-year-old girl from her screen profile and that "Julie" was a thirteen-year-old girl from her screen name, "julie13nyc." Indeed, Brand confessed to using his "Tempoteech" screen name to chat over the Internet with other girls as young as ten years old and to engaging in sexual and explicit communications with those girls. Moreover, Brand also admitted to receiving and viewing images of child pornography over the Internet, which, as we discuss below, are relevant to Brand's predisposition. All of these events occurred

---

**10.** Similarly, in *United States v. LaChapelle*, 969 F.2d 632 (8th Cir.1992), the Eighth Circuit concluded that, "because the government established that LaChapelle quickly and independently inquired about the availability of child pornography, ordered such material as soon as he could, and placed his order without being pressured to campaign against censorship, we are convinced that LaChapelle was independently predisposed to order child pornography through the mail, and therefore this case is distinct from *Jacobson*." *Id.* at 635. The court noted that its holding "conforms with *Jacobson* " because, "[u]nlike the situation here, where LaChapelle independently and unilaterally inquired about the availability of child pornography and proceeded to order such materials at the first available opportunity without the government pressuring him to do so, in *Jacobson*, the government mentioned child pornography in at least five mailings and aggressively urged Jacobson to battle censorship in four mailings before Jacobson finally broke down and ordered a magazine." *Id.* at 635 n. 7.

*prior* to, and were *independent* of, any contact by government agents, as required under *Jacobson*. Based on these circumstances, the jury could rationally find that Brand was predisposed to commit the crimes charged.

In any event, Brand's "prompt response" to the undercover agents definitively establishes his predisposition under *Jacobson* and our subsequent cases. Brand correctly points out that the transcripts of his telephone conversations with "Julie" reveal that it was Ms. Good, the private citizen pretending to be the voice of "Julie," who first broached the topic of sexual activity. However, Brand "jumped at the opportunity," *Mayo*, 705 F.2d at 69, and his "unhesitating response," *id.* at 73, included offers to touch "Julie's" "breasts," "crotch," and "ass." Brand "displayed no . . . hesitation," *Salerno*, 66 F.3d at 548, in assuring "Julie" that, if sexual intercourse with his penis hurt, he could use his fingers or tongue. Brand also promised "Julie" that she would not get "pregnant or anything" because he would use a condom. Indeed, even before "Julie" broached the topic of sexual activity, the jury could have interpreted Brand's use of sexual innuendo as "oblique requests" of enticement to engage in sexual activity. *Harvey*, 991 F.2d at 992. Moreover, Brand's statements to "Julie" were not idle chatter. Rather, Brand planned the logistics of meeting with "Julie" and, ultimately, traveled to meet "Julie" at the appointed time and place. Finally, whatever reluctance Brand may have had "quickly evaporated," *Salerno*, 66 F.3d at 548, as Brand reassured "Julie" that "i said yesterday we would do that stuff today and we will." Thus, even assuming arguendo that Brand established inducement by a preponderance of the evidence, based on the circumstances of the Internet chat room and Brand's "*prompt* response" to "Julie's" single mention of "sex stuff," the jury could rationally find that Brand possessed the requisite predisposition beyond a reasonable doubt. *Harvey*, 991 F.2d at 993.

## II. *Evidentiary Rulings*

Brand contends that the district court's admission of images of child pornography and child erotica was erroneous and highly prejudicial.[11] He argues that his possession of these images is not sufficiently similar to the crimes charged to make it probative of either intent under Federal Rule of Evidence 404(b) or of predisposition for purposes of entrapment. As noted above, the district court initially admitted a binder of sixteen images found on Brand's computer under Rule 404(b). After Brand claimed entrapment, the court admitted the remaining pictures as evidence of Brand's predisposition.[12]

11. With respect to the prejudicial nature of the images, Brand's contention seems to be that the images are prejudicial because they are not sufficiently probative of his intent or predisposition. He conflates the analysis of probativeness and prejudice. "All evidence introduced against a defendant, if material to an issue in the case, tends to prove guilt, but is not necessarily prejudicial in any sense that matters to the rules of evidence." *United States v. Quattrone*, 441 F.3d 153, 186 (2d Cir.2006). We have noted that "[e]vidence is prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *Id.* Because, as we later conclude, the images are probative, they are prejudicial to Brand, but not in a manner that matters to the rules of evidence.

12. On appeal, Brand does not challenge the district court's admission of the Internet conversation between himself and "Jenny," the FBI agent posing as "JennySFV13," as relevant to Brand's intent under Rule 404(b). Brand also does not challenge the district court's later admission of the Internet conversation between himself and "Mizbonnie," a Buffalo Police Detective posing as another

The government argues that both of the district court's evidentiary rulings were correct. Specifically, it contends that the images of child pornography and child erotica Brand possessed were properly admitted as relevant to the primary issue in dispute, namely Brand's intent to meet a minor for sex. The government further asserts that, even if the district court erred in admitting the images under Rule 404(b), these images, as well as the remaining images, were properly admitted at trial to show Brand's predisposition.

### A. Rule 404(b)

The Supreme Court has noted that Federal Rule of Evidence 404(b) [13] "generally prohibits the introduction of evidence of extrinsic acts that might adversely reflect on the actor's character, unless that evidence bears upon a relevant issue in the case such as motive, opportunity, or knowledge." *Huddleston v. United States,* 485 U.S. 681, 685, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). However, in *Huddleston,* the Court was careful to point out that "[e]xtrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct." *Id.*

"Since a district court is in the best position to evaluate the evidence and its effect on the jury, its rulings on admissibility under Rule 404(b) will not be overturned on appeal absent a clear showing of

abuse of discretion." *United States v. Pitre,* 960 F.2d 1112, 1119 (2d Cir.1992) (citing *United States v. Smith,* 727 F.2d 214, 220 (2d Cir.1984)). An abuse of discretion under Rule 404(b) requires a determination that "the district court acted arbitrarily and irrationally." *Pitre,* 960 F.2d at 1119. "The Second Circuit evaluates Rule 404(b) evidence under an 'inclusionary approach' and allows evidence 'for any purpose other than to show a defendant's criminal propensity.'" *United States v. Garcia,* 291 F.3d 127, 136 (2d Cir.2002) (quoting *Pitre,* 960 F.2d at 1118). In reviewing whether a district court properly admitted evidence under Rule 404(b), we consider whether: "(1) the prior acts evidence was offered for a proper purpose; (2) the evidence was relevant to a disputed issue; (3) the probative value of the prior act evidence substantially outweighed the danger of its unfair prejudice; and (4) the court administered an appropriate limiting instruction." *Id.* at 136 (citing *Huddleston,* 485 U.S. at 691–92, 108 S.Ct. 1496).

Before trial, during the government's *in limine* motion, and at trial, the government contended that "Brand's intent to commit the charged offenses will be the 'primary dispute.'" *Brand,* 2005 WL 77055, at *4. Similarly, in making its evidentiary rulings, the district court concluded that Brand "put his intent to commit the charged crimes at issue." *Id.* Brand does not challenge the fact that his intent was at issue. Instead, Brand challenges the district court's admission of sixteen

---

thirteen-year-old girl, as relevant to Brand's predisposition.

**13.** Federal Rule of Evidence 404(b) provides: Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation,

plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial. Fed.R.Evid. 404(b).

images of child pornography on the basis that these images were not relevant to a disputed issue. Specifically, he claims that these images were not "sufficiently similar" to the crimes charged to be relevant to the issue of intent. We disagree.

We have long acknowledged that "prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged." [14] *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir.1993). The government is required to establish only a "similarity or some connection" to establish that a prior act is relevant to one of the elements (in this case, intent) of the crime charged. *Garcia*, 291 F.3d at 137. Relevant evidence includes any "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED.R.EVID. 401.

The images Brand possessed on his computer were relevant to determining whether, in traveling across state lines to meet "Julie" and in attempting to entice "Julie," Brand intended to engage in illicit sexual activity or, alternatively, some more innocuous act. As the government points out, "[t]hese images provided a glimpse into Brand's sexual interest in children and, as such, were highly probative of whether he wanted to have sex with 'Julie' or simply to give her voice lessons, as Brand essentially contended at trial." [15] That is, the fact that Brand had images of child pornography on his computer made it "more probable ... than it would be without the evidence," Fed.R.Evid. 401, that Brand's intent was to travel to New York to engage in illicit sexual activity and to attempt to entice a minor to engage in sexual activity. Of course, this relevance is dependent on a "similarity or some connection" between Brand's possession of the photographs and his actions at Port Authority. In this case such a connection is present.

The "similarity or some connection" requirement is satisfied in the instant case because a direct connection exists between child pornography and pedophilia. We note that other courts have recognized a "link ... between child pornography and pedophilia," *United States v. Byrd*, 31 F.3d 1329, 1336 n. 9 (5th Cir.1994) (upholding the admissibility of defendant's pedophilia to show his predisposition and rebut the claim that the defendant was entrapped into ordering and receiving child

---

**14.** For example, in *Pitre*, 960 F.2d 1112, we held that prior act evidence was admissible to show appellants' knowledge or intent. Richard and Edwyn Pitre, along with several of their co-conspirators, were arrested in the middle of a narcotics transaction that had been discovered by an undercover agent working for the Drug Enforcement Administration. *Id.* at 1115–17. The district court allowed the introduction of prior narcotics transactions to show that the Pitres were "not there just to be standing there" on the night of their arrests. *Id.* at 1117. We pointed out that "[w]here a defendant's intent or knowledge is clearly at issue, evidence of prior acts may be admissible to prove intent or knowledge." *Id.* at 1119 (citing *United States v. Caputo*, 808 F.2d 963, 968 (2d Cir.1987)). We thus concluded that, because the intent or

knowledge of the Pitres was clearly at issue, "evidence of their involvement in prior narcotics transactions was probative of their intent or knowledge in connection with the crime charged." *Id.*

**15.** In fact, Brand does not seem to contend on appeal that he traveled to Port Authority for a reason as innocuous as giving "Julie" singing lessons. Rather, his brief states that "[h]e had second thoughts about meeting 'Julie' for a sexual purpose because he knew it was wrong and illegal and he was afraid he would get in trouble," but that "[h]e felt that he had to come to the Port Authority bus terminal because he didn't want 'Julie' standing there alone."

pornography).[16] The Fifth Circuit noted that the two were linked by an "abnormal sexual attraction to children." *Id.* The child pornography found on Brand's computer certainly suggests just such an abnormal sexual attraction by Brand. Brand's abnormal sexual attraction encompassed not only possession of child pornography but the desire to meet a young girl for a sexual encounter; the same urge that Brand satisfied by obtaining child erotica also inclined Brand to commit sexual crimes against children. We believe this abnormal sexual attraction to children establishes the similarity or connection required to show relevance.

In addition to indicating a broader abnormal sexual attraction to children, child pornography shares a strong nexus with pedophilia. In the Child Pornography

Prevention Act of 1996, Congress found that "child pornography is often used by pedophiles and child sexual abusers to stimulate and whet their own sexual appetites, and as a model for sexual acting out with children." Pub.L. No. 104–208, § 121, 110 Stat. 3009, *3009–26 (1996). This is wholly consistent with earlier findings that "child pornography may induce viewers to commit sex crimes on children." *Byrd,* 31 F.3d at 1336 n. 9 (citing David B. Johnson, *Why the Possession of Computer–Generated Child Pornography Can Be Constitutionally Prohibited,* 4 ALB.L.J.SCI. & TECH. 311, 326 & n. 141 (1994) (citing 1 U.S. Dep't of Justice, Attorney General's Commission on Pornography: Final Report 649–50 (1986))).[17] In our view, possession of child pornography by itself shares a connection or similarity with pedophilia.[18] Here, the record indicates that

---

**16.** In *Byrd,* the Fifth Circuit recognized the links between pedophilia and pornography in the context of proving predisposition. 31 F.3d at 1336, 1337. For reasons we articulate later, we think the links between pedophilia and pornography are equally relevant to the issue of Brand's intent.

**17.** In hearings before Congress, the FBI noted "a strong correlation between child pornography offenders and molesters of children" and that "the correlation between collection of child pornography and actual child abuse is too real and too grave to ignore." *Enhancing Child Protection Laws After the April 16, 2002 Supreme Court Decision, Ashcroft v. Free Speech Coalition: Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary,* 107th Cong. (2002) (statement of Michael J. Heimbach, Crimes Against Children Unit, Criminal Investigative Division, FBI), *available at* http://www.fbi.gov/congress/congress02/heimbach050102.htm. (last visited Oct. 4, 2006). Mr. Heimbach noted that at least part of his findings came from a report prepared by Andres E. Hernandez, Director of the Sex Offender Treatment Program, Federal Bureau of Prisons, FCI Butner. *Id.*

**18.** A recent Ninth Circuit case that some might view as contrary to our conclusion is

really of a different sort. In *United States v. Curtin,* 443 F.3d 1084 (9th Cir.2006), *petition for rehearing en banc granted,* 455 F.3d 1052 (9th Cir. Jul.28, 2006), the Ninth Circuit addressed the nature of Rule 404(b) evidence in a sharply divided opinion. Curtin was convicted of the same two counts as Brand: traveling across state lines with the intent to engage in a sexual act with a minor in violation of 18 U.S.C. § 2423(b) and using an interstate facility to attempt to persuade a minor to engage in sexual activity in violation of 18 U.S.C. § 2422(b). Like Brand, Curtin entered an Internet chat room and engaged in sexually explicit chat sessions with an undercover Las Vegas police detective posing as "Christy," a 14–year–old girl. *Curtin,* 443 F.3d at 1087. Over the Internet, Curtin invited "Christy" to meet him at a bowling alley in a Las Vegas casino and promised that they would go to a show. *Id.* After being detained by the police in the Las Vegas bowling alley in which he had planned to meet "Christy," Curtin claimed that "he expected Christy to be a thirty- to forty-year-old woman pretending to be a girl." *Id.* at 1088. The police, after arresting Curtin, seized his personal digital assistant ("PDA"), which contained over 140 stories about adults having sex with children. *Id.* The district court held, and the government argued on appeal, that the sto-

not only did Brand possess child pornography but also that he kept the images of child pornography, currently at issue, in the same computer folder in which he kept "Julie's" photograph. A reasonable juror could conclude that Brand was whetting his own sexual appetite for his encounter with "Julie." A causal link between possession of child pornography and the commission of sexual crimes need not be proven conclusively for the evidence in question to be admissible. In this case, we are confident that there is enough similarity or connection between the two so as to make the pictures on Brand's computer relevant to his intent in driving to another state to spend time with a young girl he had met in an Internet chat room entitled "I Love Older Men." The district court did not abuse its discretion.

We emphasize the limited nature of our holding today with regard to Rule 404(b). We need not decide whether it would have been an abuse of discretion for the district court not to allow the pornographic images as evidence of Brand's intent under Rule 404(b). We hold only that, under the "inclusionary approach" that our Court has adopted, *Garcia*, 291 F.3d at 136 (quoting *Pitre*, 960 F.2d at 1118), the district court

did not abuse its discretion in holding that evidence that Brand possessed child pornography was admissible under Rule 404(b) to show whether Brand's intent in attempting to entice "Julie" and traveling across state lines to meet with her involved an intent to engage in sexual activity with a minor or, alternatively, for a more benign reason.

## B. Predisposition

■ Because we conclude that the binder of images of child pornography and child erotica found on Brand's computer is admissible under Rule 404(b), our review of the remaining predisposition evidence is relatively circumscribed. We need address only those remaining images of child pornography and child erotica that the district court initially found relevant, yet unduly cumulative, with regard to Brand's intent but that the court later admitted as predisposition evidence when Brand raised his affirmative defense of entrapment.

Predisposition evidence is reviewed under a standard first articulated by Judge Hand in *Sherman* and later reaffirmed by this Court in *Harvey:*

---

ries, which depicted adults having sex with children, were relevant to the issue of Curtin's intent because Curtin continued to maintain at trial that he actually intended to meet an adult woman.

On appeal, the court concluded that the district court had abused its discretion in admitting the stories under 404(b). *Id.* at 1094. However in assessing the similarity between the prior act and the crimes charged, the court seemed to emphasize the nature of the prior act. The court noted that "[possession of] magazine articles failed to constitute a Rule 404(b) 'bad act' " and that "possession of lawful reading material was not similar to actual criminal conduct." *Id.* at 1091 (quoting *People of Territory of Guam v. Shymanovitz*, 157 F.3d 1154, 1159 (9th Cir.1998)). The court asserted that "[t]he cases in which we have allowed Rule 404(b) evidence show a

much stronger connection between the 'other act,' which is often a crime in itself, and the charged crime." *Id.* at 1092.

We need not decide whether we would have ruled the same way as the Ninth Circuit, but we do note that, while prior acts admitted under 404(b) need not be *bad* acts, Brand's possession of child pornography was, in fact, bad—it was illegal. *See* 18 U.S.C. § 2252A(a)(2)(A). It was illegal for the very reason that it is admissible. Congress has found that child pornography has a connection to an abnormal sexual interest in children and pedophilia. The fictional stories in *Curtin* presented a more difficult issue; the links between fictional stories and sexual crimes against children may not be as apparent as the links between child pornography and sexual crimes against children.

Predisposition evidence can be established by evidence of a defendant's past conduct; this past conduct should be 'near enough in kind to support an inference that his purpose included offenses of the sort charged;' although it is not necessary that the past conduct be precisely the same as that for which the defendant is being prosecuted.

*Harvey*, 991 F.2d 981 at 994 (quoting *Sherman*, 200 F.2d at 882). "[W]e review the admission of potentially prejudicial evidence, such as predisposition evidence, for an abuse of discretion." *Id.* (citing *United States v. Gantzer*, 810 F.2d 349, 351 (2d Cir.1987)).

In *Harvey*, the defendant claimed that government officials had entrapped him into receiving visual depictions of a minor engaging in sexually explicit activity. 991 F.2d at 992. The district court allowed the government agent to testify as to the nature and contents of several videotapes of simulated child pornography, as well as several X-rated videos containing adult pornography that Harvey had in his possession. *Id.* at 986–87. Applying the aforementioned standard, we concluded in *Harvey* that the government's evidence of simulated child pornography was near enough in kind to receiving child pornography. We noted that "Harvey did not claim in the district court, nor does he claim on appeal, that no reasonable person would have mistaken any of the females in these simulated child pornography materials as being underage." *Id.* at 995. We there-

fore held that the district court did not abuse its discretion in admitting this evidence because "we are unwilling to conclude that the admission of the simulated child pornography evidence unduly prejudiced Harvey." *Id.*

Under this standard, we have no difficulty concluding that Brand's past conduct—the possession of images of child pornography and child erotica [19]—is "near enough in kind" to support an inference that Brand's purpose included sexual offenses against children. Inquiries into a defendant's intent to commit a crime and his predisposition to do so are closely related and, to a significant extent, overlap. The same prior acts evidence that is relevant to establishing a defendant's intent under Rule 404(b) will very often also be "near enough in kind" for the purpose of determining a defendant's predisposition. Indeed, in *Russell*, the Supreme Court noted that "the thrust of the entrapment defense" requires a "focus on the *intent or predisposition* of the defendant to commit the crime." 411 U.S. at 429, 93 S.Ct. 1637 (emphasis added). While a defendant's intent and predisposition need not be so tightly intertwined, in the present case, Brand's intent and predisposition are. Brand's intent and predisposition share a common temporal element—his preparation for and travel to New York for the purpose of meeting his "girlfriend." More importantly, though, they share a unique locus: an abnormal sexual attraction to

---

**19.** Brand's brief acknowledges at times that the images from his computer consisted of both child pornography and pornographic pictures of adults. He does not differentiate between the two categories of images, both of which were received as rebuttal evidence on the predisposition issue. In our discussion, we focus only on the images of children. In *Harvey*, we found that evidence introduced that the defendant possessed videos depicting "[adults] performing gross acts involving hu-

man waste, and people engaging in bestiality and sadomasochism" was both irrelevant and highly prejudicial. *Harvey*, 991 F.2d at 996. While Brand's possession of adult pornography may not be relevant to his intent or predisposition to engage in sexual crimes against children, he does not contend that the images were inflammatory or in any other way prejudicial. Thus, the admission of the adult pornography was at worst harmless error.

children, as demonstrated by the child pornography on Brand's computer. Indeed, this was really the same link that existed in *Harvey*: the simulated child pornography also evinced an abnormal sexual attraction to children. As noted, there is a strong link between possession of child pornography and sexual crimes against children. Both Congress and at least one other court have concluded that possession of child pornography signals the abnormal sexual attraction to children underlying a person's motivation to commit sexual crimes against children. This link is certainly strong enough to support the inference required by *Harvey* and *Sherman*. Indeed, it would be difficult for us to conclude in this case that Brand's possession of child pornography and the crimes with which he is charged were similar or in some way connected, for purposes of 404(b), without also concluding that his possession of child pornography was near enough in kind to support an inference that his purpose, satisfying his abnormal sexual attraction to children, included offenses of the sort charged. In our view, the evidence at issue—images of child pornography found on Brand's computer—is relevant not only to the issue of Brand's intent to commit the charged crimes but also to the issue of Brand's predisposition to do so.

Finally, we note that in *Harvey* we found the predisposition evidence of simulated child pornography *admissible* but indicated that it might not have been *sufficient* to establish predisposition. However, in this case the remaining images of child pornography and child erotica represent merely a small fraction of the predisposition evidence offered to rebut Brand's claim of entrapment. As discussed above, the remaining evidence indicates that, because of the circumstances of Brand's initiating contact with "Sara" and "Julie" and Brand's "*prompt* response" to Julie's solitary mention of "sex stuff," the jury could rationally find that Brand possessed the requisite predisposition. *Harvey*, 991 F.2d at 992–93. Thus, while we conclude that the district court did not abuse its discretion in admitting these images as predisposition evidence, the government also offered more than enough evidence to establish Brand's predisposition beyond a reasonable doubt even without the admission of these images.

### III. *Sufficiency Challenge*

Brand also challenges the sufficiency of the evidence with regard to his conviction for attempting to entice a minor to engage in illegal sexual activity in violation of 18 U.S.C. § 2422(b). A defendant who challenges his conviction based upon the sufficiency of the evidence "bears a heavy burden." *United States v. Griffith*, 284 F.3d 338, 348 (2d Cir.2002). " 'Not only must the evidence be viewed in the light most favorable to the government and all permissible inferences drawn in its favor, but if the evidence, thus construed, suffices to convince any rational trier of fact of the defendant's guilt beyond a reasonable doubt, then the defendant's conviction must stand.' " *United States v. Dae Whan Kim*, 435 F.3d 182, 184 (2d Cir.2006) (per curiam) (alteration omitted) (quoting *United States v. Martinez*, 54 F.3d 1040, 1042 (2d Cir.1995)).

To establish enticement under § 2422(b), the government must prove four elements: that an individual (i) used a facility of interstate commerce; (ii) to knowingly persuade, induce or entice, or to attempt to persuade, induce or entice; (iii) any individual who is younger than eighteen-years old; (iv) to engage in sexual

activity of a criminal nature.[20] 18 U.S.C. § 2422(b). Brand challenges only the sufficiency of the evidence of the second element, contending that the evidence was insufficient as a matter of law to prove that he attempted to entice a minor to engage in sexual activity. He presses that it was the undercover FBI agent that actually did the enticing.

■ A conviction under § 2422(b) requires a finding only of an attempt to entice or an intent to entice, and not an intent to perform the sexual act following the persuasion. *See United States v. Thomas*, 410 F.3d 1235, 1244 (10th Cir. 2005); *United States v. Bailey*, 228 F.3d 637, 638–39 (6th Cir.2000). "In order to establish that a defendant is guilty of an attempt to commit a crime, the government must prove that the defendant had the intent to commit the crime and engaged in conduct amounting to a 'substantial step' towards the commission of the crime." *United States v. Yousef*, 327 F.3d 56, 134 (2d Cir.2003) (quoting *United States v. Rosa*, 11 F.3d 315, 337 (2d Cir. 1993) (quoting *United States v. Martinez*, 775 F.2d 31, 35 (2d Cir.1985))). "A substantial step must be something more than mere preparation ..." *United States v. Manley*, 632 F.2d 978, 987 (2d Cir.1980). The step "must be necessary to the consummation of the crime and be of such a nature that a reasonable observer, viewing it in context could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute." *Id.* at 987–988.

Several factors demonstrate that Brand attempted to entice a minor to engage in sexual activity. First, the government showed that Brand initiated the contact with both "Sara," whose profile indicated that she was a thirteen-year-old girl, and "Julie," whose screen name indicated that she was a thirteen-year-old girl. In fact, "Julie" mentioned that "she" was thirteen. Brand initiated contact in a chat room entitled "I Love Older Men," a forum in which adult men frequently seek children for sex. *See, e.g., United States v. Chriswell*, 401 F.3d 459, 460–61 (6th Cir.2005) (fifty-two-year-old man contacts FBI agent posing as fourteen-year-old girl in the "I Love Older Men" chat room); *United States v. Root*, 296 F.3d 1222, 1224 (11th Cir.2002) (forty-seven-year-old man contacts FBI agent posing as thirteen-year-old girl in the "I Love Older Men" chat room). The fact that the chat room is a hotbed of illegal activity—and more specifically, of attempted enticement of minors—is relevant in reviewing Brand's sufficiency challenge. The jury could have reasonably inferred that the nature of the forum, coupled with Brand's sexually explicit chats with "Sara" and "Julie," established that Brand attempted to entice a minor to engage in sexual activity. *Cf. United States v. Martin*, 426 F.3d 68, 75 (2d Cir.2005) (noting the significance, in a probable cause determination, of the fact that "the girls 12–16's welcome message unabashed-

---

20. An adult posing as a minor (in this case, Agent Berglas, an undercover FBI agent, posing as "Julie") appears to satisfy the third element of enticement, i.e., that the individual being enticed is a minor. Indeed, while Brand does not raise this issue on appeal (and thus we need not address it), all of our sister circuits that have addressed this issue have held that "a defendant may be convicted of attempting to violate § 2422(b) even if the attempt is made towards someone the defen- dant believes is a minor but who is actually not a minor." *United States v. Hicks*, 457 F.3d 838, 841 (8th Cir.2006); *accord United States v. Tykarsky*, 446 F.3d 458, 461, 464–69 (3rd Cir.2006); *United States v. Sims*, 428 F.3d 945, 949, 959–60 (10th Cir.2005); *United States v. Meek*, 366 F.3d 705, 709, 717–20 (9th Cir.2004); *United States v. Root*, 296 F.3d 1222, 1224, 1227–31 (11th Cir.2002); *United States v. Farner*, 251 F.3d 510, 511, 512–13 (5th Cir.2001).

ly announced that its essential purpose was to trade child pornography"), *reh'g en banc denied*, 430 F.3d 73 (2d Cir.2005).

Second, in addition to making the initial contact with both "Sara" and "Julie," Brand repeatedly made sexual advances towards both girls. Brand asked "Sara" for her picture, inquired whether she would be his "girlfriend," asked if he could hug her, and then indicated that "i only want to kiss you." Similarly, Brand initially asked "Julie" to send her picture. During their next conversation, Brand asked "Julie" if she wanted to date an older man, indicated that he was "free," and then asked "Julie" out on a date. During another chat session, Brand told "Julie" that "i would love to have you as a girlfriend" and asked her to "say you will be my valentine." Brand continuously steered the conversation in the direction of sexual contact. Brand stated that he "would love to kiss" "Julie," "touch and play," do "anything you want," "fool around and explore," and "do it all." He later told "Julie" over the phone that she could ride in his red convertible and watch a movie as they drove.

Overall, during his chat sessions with "Sara" and "Julie," Brand's behavior—sharing pictures, flirting, and attempting to gain affection—constituted classic "grooming" behavior in preparation for a future sexual encounter. "Child sexual abuse is often effectuated following a period of 'grooming' and the sexualization of the relationship." Sana Loue, *Legal and Epidemiological Aspects of Child Maltreatment*, 19 J. LEGAL MED. 471, 479 (1998). We have noted the government's "interest in preventing pedophiles from 'grooming' minors for future sexual encounters." *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 102 (2d Cir.2003). Brand's sexual advances and grooming behavior provide additional evidence in sup-

port of the jury's finding that Brand attempted to entice a minor. *Cf. United States v. Munro*, 394 F.3d 865, 869 (10th Cir.2005) (holding that defendant's "statements that he had money, his own place, a car, an X Box, a Play Station 2, and a DVD player could reasonably be interpreted as attempts to impress [a minor] and give her incentives to meet and engage in sexual activities").

Third, Brand's statements regarding the sex acts that he planned to perform on "Julie" provided further evidence of Brand's attempt to entice a minor to engage in sexual activity. Although Agent Berglas first mentioned the word "sex," Brand immediately proceeded to tell "Julie" the sexual acts he was going to engage in with her. He detailed that he would fondle her "breasts," "ass," and "crotch," suggested that if sex with his penis hurt he could use his fingers or tongue instead, and explained that he would use a condom so that "Julie" would not get pregnant. These sexually explicit conversations with "Julie" provided overwhelming evidence to support the jury's finding that Brand attempted to entice a minor. *See United States v. Patten*, 397 F.3d 1100, 1102–03 (8th Cir.2005) (holding that defendant's asking about minor's sexual preferences and whether she would like to "hook up" constitutes sufficient evidence under § 2422(b)); *Munro*, 394 F.3d at 869 (holding that defendant's "statements and questions regarding virginity, sexual experiences, and his desire to perform oral sex" constitute sufficient evidence under § 2422(b)).

Fourth, Brand also attempted, on several occasions, to set up a meeting with "Julie." He repeatedly asked "when can i see you," inquired when Julie's mother would be away, discussed the fact that Julie's mother would be working the next evening, and suggested that they go to his

home in New Jersey. Brand and "Julie" settled on a meeting time—noon the next day—and, at Brand's suggestion, a meeting place—the Port Authority bus terminal. Brand's actions in attempting to set up a meeting with "Julie" further support the jury's finding that Brand attempted to entice a minor. *Cf. Thomas*, 410 F.3d at 1246 (holding that defendant "crossed the line from 'harmless banter' to inducement the moment he began making arrangements to meet angelgirl12yo").

Finally, Brand took a "substantial step" towards the completion of the crime because Brand actually went to the Port Authority bus terminal, the meeting place that he had established with "Julie." *See Patten*, 397 F.3d at 1104 (holding that "clear authority for the government's position that [defendant's] act of driving to the arranged meeting place ... was relevant

evidence of a substantial step" (citing *Root*, 296 F.3d at 1228)); *Munro*, 394 F.3d at 870 (holding that defendant "took a substantial step towards completion of the crime by actually going to the prearranged meeting place"). Brand not only had a sign with "Julie's" name on it in his possession but also had three condoms in the glove compartment of his car. Brand was not the victim of a series of innocent coincidences that converged to cast him wrongfully into the hands of the FBI. There was more than sufficient evidence for the jury to conclude that Brand attempted to entice a minor to engage in sexual activity in violation of 18 U.S.C. § 2422(b).[21]

## IV. *Jury Instructions*

Brand also raises four objections to the district court's jury instructions.

---

21. We also reject Brand's contention that the evidence of enticement was insufficient, as a matter of law, because of the government's alleged inducement. We assumed above, without deciding, that Brand had established inducement by a preponderance of the evidence. A finding of inducement, however, is not inconsistent with a finding that a defendant attempted to entice a minor, especially where, as here, the enticement began prior to any governmental inducement. Indeed, Brand fails to cite to any case in which a finding of inducement, the government's concession of inducement, or even a submission of the inducement issue to the jury precluded, as a matter of law, the government from establishing the elements of enticement under 18 U.S.C. § 2422(b) or any other statutory provision.

In a similar situation, the Eighth Circuit held in *United States v. Blazek*, 431 F.3d 1104 (8th Cir.2005), that the government had established sufficient evidence to support a conviction for enticement under 18 U.S.C. § 2422(b). *Id.* at 1107–08. Blazek argued that "the evidence was insufficient to prove he intended to entice a minor to engage in illegal sexual activity because Inspector Everett," a member of the Chicago Police Department posing as "Brian," a fifteen-year-old

boy, actually was "the one doing the enticing." *Id.* In *Blazek*, as in the instant case, the district court charged the jury on the issues of entrapment and predisposition. *Id.* The Eighth Circuit rejected Blazek's contention that the possibility of inducement precluded a finding of attempted enticement. The court noted that Blazek had initiated contact, engaged in sexual conversations, arranged to meet, and traveled to meet with "Brian." *Id.* Based on these circumstances, the court concluded that "a reasonable jury could find that Blazek intended to entice a minor to engage in illegal sex." *Id.*

Brand, like Blazek, contends that the undercover agent actually did the enticing and points out that the district court charged the issue of entrapment to the jury. However, like Blazek, Brand initiated contact with both "Sara" and "Julie." Brand, believing that "Julie" was a thirteen-year-old girl, also engaged in sexually explicit conversations and classic grooming behavior. Finally, like Blazek, Brand arranged to meet with a minor and then traveled to the meeting place. Thus, even assuming that Brand established inducement, a reasonable jury could find that Brand intended to entice a minor to engage in sexual activity with a minor in violation of 18 U.S.C. § 2422(b).

We note that the trial court "enjoys broad discretion in crafting its instructions which is only 'circumscribed by the requirement that the charge be fair to both sides.'" *United States v. Russo,* 74 F.3d 1383, 1393 (2d Cir.1996) (quoting *United States v. GAF Corp.,* 928 F.2d 1253, 1263 (2d Cir. 1991)). Although a defendant is "entitled to have the court charge the jury on any defense theory for which a foundation existed in the record, he [is] not necessarily entitled to have that instruction communicated to the jury in the language of his choice." *Salerno,* 66 F.3d at 549 (citing *United States v. Johnson,* 994 F.2d 980, 988 (2d Cir.1993)). " 'Rather, a charge is sufficient if it adequately appraises the jury of the crime and the defense.'" *Id.* (quoting *Johnson,* 994 F.2d at 988). " 'We review a claim of error in jury instructions *de novo,* reversing only where, viewing the charge as a whole, there was a prejudicial error.'" *United States v. Quattrone,* 441 F.3d 153, 177 (2d Cir.2006) (quoting *United States v. Aina–Marshall,* 336 F.3d 167, 170 (2d Cir.2003)).

■ Brand's first contention focuses on the district court's instruction regarding the elements of entrapment. The district court instructed the jury that "a defendant may not be convicted of a crime if it was the government who gave the defendant *the idea* to commit the crime, if it was the government who also persuaded him to commit the crime, and if he was not ready and willing to commit the crime before the government officials or agent first spoke with him." Brand argues that the district court erred in using the phrase "the *idea* to commit the crime" rather than "the *readiness* and *willingness* to commit the crime." He contends that the court's instruction erroneously suggests that predisposition can be shown simply by proof that he had the "idea" to commit a crime. We disagree.

The district court's instruction explicitly and accurately articulates the two prerequisites of entrapment: inducement by the government and a defendant's lack of predisposition. In fact, in the very same sentence about which Brand complains, the district court conveys that predisposition turns on whether the defendant was *"ready and willing* to commit the crime." The district court repeated this requirement elsewhere in the charge, instructing the jury that the inquiry turns on whether "you find beyond a reasonable doubt that the defendant was predisposed, that is *ready and willing,* to commit the offenses charged ...."; *cf. United States v. Williams,* 705 F.2d 603, 618–19 (2d Cir. 1983) (concluding that even an erroneous statement in a jury charge did not warrant reversal because, among other things, "the isolated remark complained of was followed by a rereading of the full charge on entrapment, which correctly set forth the applicable principles" (footnote omitted)). Our conclusion that the district court did not err in defining entrapment is supported by the fact that the charge mirrors the model language from *Sand's Modern Federal Jury Instructions*—language we have previously approved. *See United States v. Han,* 230 F.3d 560, 565 (2d Cir. 2000).

■ Brand's next objection is to the placement of the "investigative techniques" charge. The district court's charge on investigative techniques describes the government's legitimate use of covert agents. Brand contends that the district court's placement of this instruction immediately following the entrapment charge undermined the very factfinding task that the jury was supposed to undertake with respect to his entrapment defense.

Contrary to Brand's argument, the district court did not err in its placement of the "investigative techniques" charge. "It

is a 'well established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.'" *United States v. Torres,* 901 F.2d 205, 240 (2d Cir.1990) (quoting *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)). In *United States v. Braver,* 450 F.2d 799 (2d Cir. 1971), a defendant mounted a challenge similar to Brand's contention. Braver claimed that "a portion of the district court's charge explaining the rationale of the entrapment defense in essence told the jury that the government activities in this case were proper." *Id.* at 805. In rejecting Braver's challenge, we held that "[t]he district court merely explained the policy behind the entrapment defense and clarified the proper relationship of that defense with such law enforcement stratagems as undercover investigation and informers." *Id.* While in *Braver* the district court placed the investigative techniques charge immediately *before* the entrapment charge, *id.* at 806, the district court's placing this charge immediately *after* the entrapment charge was certainly within the court's "broad discretion" in crafting jury instructions. *Russo,* 74 F.3d at 1393. "Since the composition of jury instructions is not an exact science, many formulations may be adequate." *United States v. Smith,* 131 F.3d 685, 688 (7th Cir.1997). A reasonable juror clearly would have understood from the placement and overall context of the jury instruction, as well as from the trial as a whole, that it was *permissible* for the government to use covert agents but that it was *impermissible* for the government to use covert agents to entrap Brand. We reject Brand's suggestion that a reasonable jury could have interpreted the court's instructions as precluding the possibility of entrapment.

Brand's final two objections involve the district court's limiting instruction regarding the purpose of the child pornography evidence under Rule 404(b). The district court instructed the jury:

> The government is offering evidence *tending to show* that on a different occasion the defendant [Matthew Adam Brand] engaged in conduct *similar* to the charges in the indictment.
>
> In that connection, let me remind you that the defendant is not on trial for committing this act not alleged in the indictment. Accordingly, you may not consider this evidence of the *similar acts* as a substitute for proof that the defendant committed the crime charged, nor may you consider this evidence as proof that the defendant has a criminal personality or bad character. The evidence of other, *similar act* was admitted for a much more limited purpose, and you may consider it only for that limited purpose.

Brand challenges the district court's description of the government's evidence as "tending" to show rather than "offered" to show. He asserts that the district court's instruction erroneously suggested that the government's evidence had already proven the facts in dispute. Brand also challenges the district court's use of the phrase "similar" acts rather than "other" or "prior" acts. He contends that the use of this phrase improperly presumed a similarity, which was contested, between the Rule 404(b) evidence and the charged offenses.

Both of Brand's arguments are without merit. As an initial matter, the challenged language in the district court's limiting instruction was drawn almost verbatim from the model language of the *Sand* federal charge—a limiting instruction that, as noted above, we have endorsed on several occasions. *See United States v. La Flam,* 369 F.3d 153, 157 n. 2 (2d Cir.2004); *Unit-*

ed States v. Livoti, 196 F.3d 322, 327 (2d Cir.1999). While Brand contends that the *Sand* limiting instruction should be tailored to the circumstances of each case, the district court's rejection of the specific tailoring Brand suggested was, once again, within the district court's "broad discretion" in crafting jury instructions. *Russo*, 74 F.3d at 1393.

Specifically, Brand's challenge to the phrase "tending to show" is without merit because, in addition to being drawn from the *Sand* federal charge, the phrase "tending to show" modifies the government's act of "offering evidence." Thus, the district court's use of the word "tending" describes (and describes accurately) the government's argument regarding its purpose for introducing this evidence rather than the ultimate factual issue, which the district court charged to the jury. Indeed, we have previously used the same phrase, "tending to show," in describing Rule 404(b) evidence that a district court had properly admitted. *See United States v. Warren*, 453 F.2d 738, 745 (2d Cir.1972) (affirming the district court's holding and concluding that "evidence, *tending to show* acts similar to those charged in the indictment, was admissible to show intent to violate the law and to negate the defense of entrapment ..." (emphasis added)). Thus, the district court's use of the phrase "tending to show" did not constitute reversible error.

Similarly, Brand's challenge to the phrase "similar" acts also fails and does so for comparable reasons. The phrase "similar" acts is also drawn from the *Sand* federal charge. In addition, it is highly unlikely that the jury would have utilized the out-of-context reading of "similar" acts that Brand suggests. Indeed, throughout the trial, the district court allowed the parties to argue about the degree of similarity between the Rule 404(b) evidence and the charged offenses. Moreover, as discussed above, prior acts evidence admitted under Rule 404(b) does not have to comprise precisely the same act at issue in the crimes charged if there is "some connection" between the reason for introducing the prior act and the nature of the crimes charged. Thus, if anything, the district court's limiting instruction and its jury instruction were more narrow than necessary. As a result, the district court's use of the phrase "similar" acts rather than "other" or "prior" acts does not constitute reversible error.

CONCLUSION

We hold that Brand's entrapment defense cannot succeed because the government provided sufficient evidence for the jury to conclude that the prosecution had established predisposition. We also hold that the district court did not err in admitting Brand's child pornography as prior acts evidence under Rule 404(b) to show Brand's intent to commit the crimes charged and as predisposition evidence. We hold as well that there was more than sufficient evidence for the jury to conclude that Brand attempted to entice a minor to engage in sexual activity in violation of 18 U.S.C. § 2422(b). Finally, we hold that the district court, in instructing the jury as to the entrapment defense and Rule 404(b), did not commit reversible error. Accordingly, the judgment of the district court is **AFFIRMED**.